2020 PA Super 15

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 779 EDA 2019 |

Appeal from the Decree Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000678-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: E.R.-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 780 EDA 2019 |

Appeal from the Decree Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s):  CP-51-AP-0000677-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: D.R.-W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: D.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 886 EDA 2019 |

J-A27033-19

Appeal from the Order Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000874-2017

IN THE INTEREST OF: E.R.-W., A : IN THE SUPERIOR COURT OF
MINOR : PENNSYLVANIA
:
:
:
APPEAL OF: D.W., FATHER :
:
:
:
:
: No. 887 EDA 2019

Appeal from the Order Entered December 12, 2018
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000875-2017

BEFORE: BOWES, J., SHOGAN, J., and COLINS, J.[*]

OPINION BY SHOGAN, J.: **FILED JANUARY 29, 2020**

D.W. ("Father") appeals from the decrees[1] entered December 12, 2018,

which terminated involuntarily his parental rights to his son, D.R.-W., born in

January 2013, and his daughter, E.R.-W., born in March 2017 (collectively,

"the Children").[2] Father also appeals from the orders entered that same day,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Father filed separate notices of appeal for each child, and for each order;
thus ***Commonwealth v. Walker***, 185 A.3d 969, 971 (Pa. 2018), which
requires that "where a single order resolves issues arising on more than one
docket, separate notices of appeal must be filed for each of those cases," is
satisfied.

[2] In addition, the trial court entered separate decrees terminating the
parental rights of the Children's mother, S.R. ("Mother"), and of the possible
unknown father of E.R.-W. Neither Mother, nor any unknown father, filed an
appeal.

- 2 -

which changed the Children's permanent placement goals from reunification to adoption. After careful review, we affirm.

The record reveals that the Philadelphia Department of Human Services ("DHS") filed dependency petitions regarding the Children on March 30, 2017. Therein, DHS stated that it received a General Protective Services report on February 3, 2017, which alleged substance abuse and mental health concerns with respect to Mother. DHS averred that it received a subsequent General Protective Services report on March 21, 2017, following the birth of E.R.-W. The report alleged that E.R.-W. was born prematurely and tested positive for methadone, and that Mother tested positive for methadone, benzodiazepines, and PCP shortly prior to E.R.-W.'s birth. As for Father, DHS averred that he had a history of unstable housing and drug-related convictions. On April 12, 2017, the trial court entered orders adjudicating the Children dependent and placing them in Father's care. The court also referred Father for drug screens and a substance abuse assessment and directed that he enroll in services at the Achieving Reunification Center ("ARC").[3]

This arrangement did not last, and DHS obtained emergency protective custody of the Children less than two months later on May 30, 2017. In its applications for emergency protective custody, DHS averred that Father's whereabouts were unknown, and the Children were living with their maternal

_____

[3] The trial court entered amended orders of adjudication and disposition on the same day, apparently to correct a typographical error.

grandmother, who was an indicated perpetrator of child abuse.[4]   The trial court entered shelter-care orders on June 1, 2017, and placed the Children in foster care.[5]

Following the Children's placement in foster care, Father made minimal progress toward regaining custody.  The Community Umbrella Agency ("CUA") prepared a series of Single Case Plan ("SCP") goals for Father, which included obtaining substance-abuse treatment, following all recommendations, complying with random drug screens, receiving services at ARC, obtaining stable housing, and obtaining proper employment.  N.T., 12/12/18, at 17.  As the record demonstrates, Father made little progress toward completing his goals throughout the life of this case.

The trial court conducted a permanency review hearing on October 13, 2017.  N.T., 12/12/18, at 17.  At the time of the hearing, Father was not visiting the Children, did not have stable housing, and was not attending ARC. *Id.* at 19.  He tested positive for opiates on August 31, 2017. *Id.*  In addition, while Father was scheduled for a substance abuse assessment on September 26, 2017, he failed to appear. *Id.*  Father was arrested for a parole violation after the October 13, 2017 hearing, and was incarcerated for an unspecified period. *Id.* at 20.

---

[4]  Pursuant to 23 Pa.C.S. § 6303(a)(1), a report of child abuse is "indicated" where "an investigation by the department or county agency determines that substantial evidence of the alleged abuse by a perpetrator exists…."

[5]  DHS filed amended dependency petitions on June 3, 2017, although the Children were already dependent.

Additional permanency review hearings took place on January 10, 2018, and March 20, 2018. N.T., 12/12/18, at 20. Father remained noncompliant with his SCP objectives at the time of these hearings. *Id.* CUA did not have an address for Father and he failed to make his whereabouts known. *Id.* at 21. As a result, the trial court suspended Father's visits with the Children. *Id.* at 20-21. Father's visits were reinstated after a permanency review hearing on June 21, 2018. *Id.* at 21-22. Father was residing in a recovery house, and the trial court granted him two supervised visits per month. *Id.* at 22. Despite Father's efforts to address his substance abuse problems, he remained noncompliant with the remainder of his objectives. *Id.* On August 21, 2018, DHS filed petitions to terminate Father's parental rights to the Children involuntarily and to change the Children's permanent placement goal from reunification to adoption.

A final permanency review hearing took place on September 5, 2018. By that time, Father had attended an intake appointment at ARC on August 22, 2018. *Id.* at 23. However, he failed to follow up with services after the appointment, and ARC discharged him as of November 27, 2018. *Id.* Father also failed to provide CUA with an address, despite several requests. *Id.* at 23-24.

On December 12, 2018, the trial court conducted a hearing on DHS's termination and goal change petitions. At the conclusion of that hearing, the trial court announced its intention to terminate Father's parental rights and to change the Children's permanent placement goals from reunification to

- 5 -

adoption. The court entered its termination decrees and goal change orders that same day, memorializing its decision. Order, 12/12/18. Father did not file an appeal from the decrees or orders within the requisite thirty-day period. Pa.R.A.P. 903. Instead, Father filed pleadings entitled "Petition for Leave to File Petition for Allowance of Appeal Nunc Pro Tunc" on January 24, 2019. He filed additional pleadings with the same title on February 25, 2019, in which he corrected a typographical error on two of the pleadings and added a doctor's note. The court granted permission to appeal *nunc pro tunc* on February 26, 2019. Father timely filed notices of appeal on March 19, 2019, and March 21, 2019, along with concise statements of errors complained of on appeal.

Father now raises the following claims for our review:

1. The trial court committed an error of law and discretion by changing the permanency goal from reunification to adoption where [DHS] failed to provide sufficient evidence that such a goal change would be best suited for the [C]hildren's needs and welfare.

2. The trial court committed an error of law and abuse of discretion by involuntarily terminating [Father's] parental rights under 23 Pa. C.S. § 2511 (a), where the evidence showed that Father substantially complied with [SCP] goals established by [DHS].

3. The trial court committed an error of law and abuse of discretion by involuntarily terminating [Father's] parental rights under 23 Pa. C.S. § 2511 (a) and (b), where [DHS] failed to prove by clear and convincing evidence that involuntar[il]y terminating [D.W.'s] parental rights would best serve the emotional needs and welfare of the [C]hildren as an extension of time under 42 Pa.C.S. § 6351 (f) (9) would best serve D.R.-W's needs and welfare.

Father's Brief at 7-8.

Preliminarily, we note that Father's brief fails to comply with Pa.R.A.P. 2119(a), which requires that the argument section shall "be divided into as many parts as there are questions to be argued. . . ." Despite including three questions involved, the argument portion of Father's brief is comprised of one undivided section. Moreover, although Father presents questions regarding the trial court's decisions under Sections 2511(a) & (b) of the Adoption Act, Father makes no effort in his brief to analyze the relevant statutory subsections of the Adoption Act. Instead, he fails to cite or discuss the Adoption Act entirely, opting to focus on his claim that the trial court terminated his rights based on a mechanical application of a section of the Juvenile Act, 42 Pa.C.S. 6301 *et seq.*[6] Given the lack of discussion and citation

---

[6] In his brief, Father challenges the evidence supporting the involuntary termination of his parental rights, arguing that "compelling reasons" existed to continue with reunification efforts. Father's Brief at 12-13. Father directs our attention to 42 Pa.C.S. § 6351(f)(9) of the Juvenile Act, which requires that trial courts determine whether the county agency has filed a termination petition once a child has remained in foster care for fifteen of the last twenty-two months. Father's Brief at 13. That section contains the following language:

> (9) If the child has been in placement for at least 15 of the last 22 months or the court has determined that aggravated circumstances exist and that reasonable efforts to prevent or eliminate the need to remove the child from the child's parent, guardian or custodian or to preserve and reunify the family need not be made or continue to be made, whether the county agency has filed or sought to join a petition to terminate parental rights and to identify, recruit, process and approve a qualified family to adopt the child unless:

to relevant legal authority, we find that Father has waived any issues relating to error on the part of the trial court as it relates to 23 Pa.C.S § 2511. ***See, e.g., In re A.P.***, 920 A.2d 1269, 1275 (Pa. Super. 2007) (finding issue waived where mother failed to develop or cite any authority in support of argument).

---

> (i) the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child;
>
> (ii) the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child; or
>
> (iii) the child's family has not been provided with necessary services to achieve the safe return to the child's parent, guardian or custodian within the time frames set forth in the permanency plan.

42 Pa.C.S. § 6351(f)(9). Father emphasizes an exception to this requirement, found at 42 Pa.C.S. § 6351(f)(9)(ii), which provides that the court need not make the required finding if the county agency documents a compelling reason that filing a petition would not serve the subject child's needs and welfare. Father's Brief at 14. Father asserts that the compelling reason in this case was his compliance with his SCP goals. ***Id.*** at 15, 22-23, 30-31. Specifically, Father asserts that he had overcome his drug addiction and maintained sobriety for approximately one year at the time of the hearing, and that he had maintained a job for four months. ***Id.*** at 15, 20, 30. Father acknowledges that he failed to attend services at ARC, but insists that he will be able to complete that goal as well, "in a minimal amount of time." ***Id.*** at 15-16, 20, 24. The subsection upon which Father relies does not address whether the court should actually grant a termination petition when DHS files one.

In this case, we see no indication in the trial court's opinion or in the transcript of the hearing that the court relied on an erroneous interpretation of Section 6351(f)(9) to terminate Father's parental rights. A review of the trial court's opinion confirms that it applied the correct statutory authority, Section 2511 of the Adoption Act, when reaching its decision.

Even if we were to reach the merits of Father's argument that the trial court erred in finding termination of Father's parental rights was proper under 23 Pa.C.S. §§ 2511(a) and (b), we would find no error.

Our standard of review in termination of parental rights cases

> requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. 23 Pa.C.S. § 2511. It requires a bifurcated analysis as follows:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

In the instant matter, the trial court terminated Father's rights to the Children pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b). We need only agree with the court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Here, we analyze the court's decision pursuant to Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> * * *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. §§ 2511(a)(2), (b).

- 10 -

We first consider whether the trial court committed an error of law or an abuse of its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2).

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). As this Court has held, "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa. Super. 2002) (citations omitted).

The trial court explained its decision to terminate Father's parental rights as follows:

> This [c]ourt found the testimony of the CUA case workers to be credible and persuasive and found Father's testimony to be incredible and self-serving. This [c]ourt's decision to terminate Father's parental rights to the Children was based on clear and convincing evidence which established that Father's conduct for at least the six months prior to the filing of the petition to terminate[] revealed a settled purpose relinquishing parental claim to the Children and revealed a failure to perform parental duties. This [c]ourt found the evidence supported th[e] conclusion that Father lacks the present and future capacity to provide parental care, control or subsistence necessary for the Children's physical and mental well-being. Father cannot provide for the Children's basic

- 11 -

needs nor can he provide a structured environment for these Children.

This [c]ourt found that DHS proved by clear and convincing evidence that Father is incapable of providing safety and permanency for these Children now and in the future. This [c]ourt is not persuaded that Father can or will remedy the conditions which continue to exist and which brought the Children into supervision.

Trial Court Opinion, 5/16/19, at 25-26.

After careful review of the record in this matter, we discern no error of law or abuse of discretion. Moreover, we conclude that the record supports the trial court's decision to terminate Father's parental rights pursuant to Section 2511(a)(2). The trial court adjudicated the Children dependent on April 12, 2017, and placed them in Father's care. However, this arrangement lasted less than two months, and DHS obtained emergency protective custody May 30, 2017. The CUA case manager, Ms. Michele Jackson, testified that DHS obtained emergency protective custody after Father abandoned the Children with their maternal grandmother and disappeared. N.T., 12/12/18, at 14, 42-43. Father then tested positive for opiates on August 31, 2017. *Id.* at 19. He failed to attend a substance abuse assessment on September 26, 2017, before being arrested for a parole violation following the October 13, 2017 hearing, resulting in an unspecified period of incarceration. *Id.* at 19-20. Subsequently, CUA had no address for Father and his whereabouts were unknown. *Id.* at 21.

Ms. Jackson testified that Father entered substance-abuse treatment in March of 2018. N.T., 12/12/18, at 32-33. At the time of the June 2018 hearing, Father resided in a recovery house but remained noncompliant with services at ARC. *Id.* at 33, 21-22. While Father attended an intake appointment at ARC on August 22, 2018, he then failed to follow up with services, resulting in his discharge. *Id.* at 23. Father's circumstances remained essentially the same at the time of the hearing on December 12, 2018, with the exception that he presented brief, self-serving testimony that he held employment for the past four or five months, and that he would be looking at potential housing the next day. *Id.* at 131-133. It was within the trial court's discretion to reject this testimony as not credible. *See In the Interest of D.F.*, 165 A.3d 960, 966 (Pa. Super. 2017) ("The [trial court] is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence.").

As this Court has emphasized, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006). The trial court did not abuse its discretion in finding that 23 Pa.C.S. § 2511(a)(2) was satisfied.

Turning to 23 Pa.C.S. § 2511(b), we apply the following analysis:

Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the [S]ection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) (quotation marks and citations omitted)).

In the instant matter, Father argues that he and the Children share a bond, although he acknowledges that this bond was "rebuilding" at the time of the termination proceedings. Father's Brief at 24. In addition, Father maintains that the Children wanted to return to his care, and he stresses that the Children's legal counsel requested a bonding evaluation. *Id.* at 16, 25-27. He contends that DHS rushed to terminate his rights and that the trial court placed insufficient weight on the Children's preference. *Id.* at 16, 25, 29-30. Father insists that there is no risk of "foster care drift" in this case

because the Children have remained in the same foster home since their shelter care hearing and likely will continue to remain there in the event this Court reverses the termination decrees. *Id.* at 14-15.

The trial court explained its reasoning with regard to Section 2511(b) as follows:

> Testimony by Ms. Jackson and Ms. [Adia] Gettysmith, the CUA case workers, provided credible, persuasive testimony regarding the Children's physical and emotional needs, best interests and with whom the Children have a parental bond. They testified that Father has minimal contact with the Children and only when prompted by Mother. Ms. Jackson stated there is no engagement [and] no interaction between [E.R.-W.] and Father. At the conclusion of the visits, the Children are happy to return to their foster parents. She stated the foster parents provide safety, care, and meet all of the Children's emotional and day-to-day needs. There is a parental bond between the Children and their Foster Parents. She noted that D.R.[-]W.[] recognizes his Father[;] however, she opined there is no parental bond between them. Regarding [E.R.-W.], the [c]hild has minimal recognition and in fact, Father has never been seen by the visitation observers to have held the [c]hild, and only interacts with the Children when prompted by Mother. Both social workers opined the Children would not suffer irreparable harm if Father's parental rights were terminated and it would be in their best interest to be adopted.
>
> Susan Rubinovitz, [the Children's legal counsel,] testified she met with the Children over the weekend. D.R.[-]W. told her he wants to go home to live with his real Mom and Dad. He refers to his foster parent as "foster mom."
>
> Here, the totality of the evidence supports the [c]ourt's conclusion that termination of Father's parental rights is in the best interest of these Children. This [c]ourt found that termination of Father's parental rights met the developmental, physical and emotional needs and welfare of the Children, and the statutory requirements for involuntary termination of his parental rights pursuant to 23 Pa.C.S. [§] 2511(b) were met.

Trial Court Opinion, 5/16/19, at 27-28.

We discern no error of law or abuse of discretion in this assessment. As detailed above, Father has had minimal contact with the Children since their placement in foster care. The trial court adjudicated the Children dependent in April 2017, when D.R.-W. was four years old and E.R.-W. was only one month old. It is not clear from the record how much time D.R.-W. spent with Father prior to his adjudication, although Ms. Jackson's testimony appears to indicate that contact was sporadic. *See* N.T., 12/12/18, at 26 ("There was a sporadic in and out before even in placement."). After their adjudication, the Children lived with Father for just over one month until Father abandoned them into the care of their maternal grandmother, an "indicated perpetrator" of child abuse, in May 2017. Ms. Jackson testified that Father then failed to visit with the Children and was incarcerated. *Id.* at 18-20. In total, Father visited with the Children only once prior to the suspension of his visits in September 2017, and only five times, in June 2018, July 2018, August 2018, September 2018, and November 2018 after his visits resumed. *Id.* at 22-23, 29, 38.

Ms. Jackson testified that she was present during the first two of Father's reinstated visits, and that D.R.-W. was "not engaged" and did not interact with Father during either of them. N.T., 12/12/18, at 28-30. Concerning D.R.-W.'s relationship with Father, Ms. Jackson explained, "[D.R.-W.] identifies who [Father] is . . . . He does know who he is. The kids have both expressed fear of him to the foster parent, though." *Id.* at 26. As for E.R.-W., Ms. Jackson

testified that the child "gets very upset upon leaving the foster mother on all of her visits. And there is no engagement. There's no interaction." *Id.* at 45. Ms. Jackson added that she spent most of E.R.-W.'s visits with Father just "trying to calm the child down because she was too upset." *Id.* Ultimately, she opined that neither child would suffer irreparable harm if the trial court terminated Father's parental rights and that termination would be in the Children's best interests.[7] *Id.* at 27, 47.

On cross-examination, the Children's legal counsel asked Ms. Jackson whether she was aware that D.R.-W. wanted to live with his birth parents. N.T., 12/12/18, at 32. Ms. Jackson responded that D.R.-W. was "somewhat confused at this point, yes." *Id.* At the conclusion of the hearing, counsel summarized her own meeting with the Children, as follows:

> I met with the children over the weekend. Very early on in the visit, they started telling me about how they want to go home. [D.R.-W.] told me he wanted to go home to live with his real [M]other and [F]ather. And [the Children's half-sibling, A.,[8]] told me she wanted to go live with her birth mother. And that was without me mentioning their real parents.
>
> I just said, you know, "do you want to stay here for a long time?" And they both right away told me they wanted to go home with their real parents. I asked -- I pointed to the foster mother. And I asked both of them who is this? 'Cause normally, a lot of times the children tell me it's the "mommy" or their "mom."

---

[7] It is important to note that the trial court was under no obligation to order a bonding evaluation before terminating Father's rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (citations omitted) ("When conducting a bonding analysis, the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well.").

[8] A. is not Father's child, and she is not involved in the instant appeal.

> And they both referred to her as their "foster mom." And they both told me more than once in the visit that they want to go home with their birth parents and that they enjoy the visits with their birth parents.

*Id.* at 152-153.

While DHS's testimony was not consistent with D.R.-W.'s preference as reported by his legal counsel, that inconsistency does not require reversal of the termination decrees. The Adoption Act and our case law provide that trial courts must appoint legal counsel to represent the preferred outcome of children in contested involuntary termination matters. *See* 23 Pa.C.S. § 2313(a); *In re T.S.*, 192 A.3d 1080, 1082 (Pa. 2018).[9] However, a child's preferred outcome is not controlling, especially where that child is under twelve, and his or her consent is not necessary to effectuate an adoption. *See* 23 Pa.C.S. § 2711(a) ("[C]onsent to an adoption shall be required of . . . [t]he adoptee, if over 12 years of age."). In this case, given D.R.-W.'s young age, and given that his preference appeared immature and completely at odds with other evidence of record, which established that he had barely even seen

---

[9] In *In re L.B.M.*, 161 A.3d 172 (Pa. 2017) our Supreme Court explained that a child's legal interests, or preferred outcome, is distinct from a child's best interests, which is determined by a court. In the instant case, Susan M. Rabinovitz, Esq., was appointed counsel TPR counsel, representing the legal interests of the Children. Maureen F. Pie, Esq., was appointed the Children's guardian ad litem, representing the Children's best interests. Where, as here, the Children's legal interests are not synonymous with their best interests, those interests must be represented separately. *In re L.B.M.*, 161 A.3d at 182.

Father for over one year and one-half, it was well within the court's discretion to accord that preference little weight.[10]

The trial court also considered the Children's bond with their foster parents. *See T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."). Here, Ms. Jackson testified that the Children resided together in the same foster home. N.T., 12/12/18, at 13, 99. E.R.-W. has resided there nearly her entire life, since June 2017, while D.R.-W. has resided there since July 2017. *Id.* at 98-99. Ms. Jackson opined that D.R.-W. shares a bond with his foster parents and refers to them as "Mom" and "Dad." *Id.* at 25-26. D.R.-W. is thriving in the foster home, and he shares "a very close connection" with his foster parents' biological children as well. *Id.* at 25, 27. With regard to E.R.-W., Ms. Jackson opined that she, too, shares a bond with the foster parents and is "doing great" in foster care.[11] *Id.* at 46-47. Taken together, this

_____

[10] We note that E.R.-W. was less than two years old at the time of the hearing and she was nonverbal. N.T., 12/12/18, at 106. Therefore, her preferred outcome was incapable of ascertainment.

[11] Similarly, the visitation coach, Adia Gettysmith, testified that she observed three of Father's visits with the Children. N.T., 12/12/18, at 116. She reported that Father interacted with the Children during the visits only "if prompted by Mom." *Id.* Concerning D.R.-W.'s demeanor, Ms. Gettysmith testified that the child appears "[h]appy" when he is with his foster parents but only "[n]eutral" when he is with Father. *Id.* at 121-22. She testified that E.R.-W. also appears "happy" when she sees her foster mother but that the

evidence confirms that involuntary termination of Father's parental rights and adoption by the foster parents would best serve the Children's needs and welfare. We therefore affirm the termination decrees pursuant to Section 2511(b).

Finally, we turn our attention to Father's first claim on appeal, in which he challenges the trial court's decision to change the Children's permanent placement goals from reunification to adoption. Father waived this claim by failing to develop it in his appellate brief. ***See In re M.Z.T.M.W.***, 163 A.3d 462, 465 (Pa. Super. 2017) ("It is well-settled that this Court will not review a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority."). Father indicates at the start of his brief that he is appealing only the decrees terminating his parental rights. Father's Brief at 6. However, as discussed *supra*, the argument section of Father's brief is comprised of a single section. While Father mentions the goal change in his argument, he appears to be conflating the court's goal-change orders with its termination decrees and does not present a distinct goal-change claim supported by citation to relevant legal authority. Notably, even if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees. ***See In re D.A.***, 801

_____

child cries when she is "passed off" to Mother for a visit. ***Id.*** at 119. When asked how E.R.-W. reacts when she is passed off to Father, Ms. Gettysmith replied that she had never seen E.R.-W. passed off to Father. ***Id.***

A.2d 614, 616 (Pa. Super. 2002) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.").

Even accepting for the sake of argument that Father did not waive this claim and that it is not moot, we would conclude he is not entitled to relief. We review goal-change orders pursuant to an abuse-of-discretion standard of review. **In re R.J.T.**, 9 A.3d 1179, 1190 (Pa. 2010). As such, we must accept the trial court's findings of fact and credibility determinations if the record supports them, but we need not accept the court's inferences or conclusions of law. **Id.**

The Juvenile Act governs proceedings to change a child's permanent placement goal. 42 Pa.C.S. §§ 6301-6375. Trial courts must apply the following analysis:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the [trial] court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-1089 (Pa. Super. 2011) (citations and quotation marks omitted).

The trial court explained its decision to change the Children's goals as follows:

> This [c]ourt reasoned that DHS has provided Father with necessary referrals to services to allow him to be reunited with his Children, however, he has not complied with these referrals in the time frames set forth in the permanency plan. The Children are doing well with their foster parents and they cannot be expected to place their future on hold to wait for Father to get his life in order.
>
> The Pennsylvania Juvenile Act, as amended to reflect the principles of the Federal Adoption and Safe Families Act (["]ASFA["]) which focuses on safety and permanency as the paramount concerns in planning for dependent children, ranks the permanency options for children using a hierarchical priority. The permanency options are listed first to last and each preceding option must be ruled out before the next can be chosen as a viable permanency option. . . . Pursuant to the hierarchy of permanency option[s], the option of "placement with a legal custodian" is listed third. Once reunification is ruled out, the second preferred permanency option is adoption. Adoption has been clearly established as the appropriate goal in the best interest of these Children.

Trial Court Opinion, 5/16/19, at 29-30.

We again discern no error of law or abuse of discretion. As we have discussed throughout this Opinion, Father has demonstrated that he is incapable of parenting the Children and that he will not be capable of parenting the Children at any point in the foreseeable future. In addition, the Children do not share a bond with Father and instead share a bond with their foster

parents. It is clear that changing the Children's permanent placement goals to adoption would be in their best interests.

Based on the foregoing, we conclude that the trial court did not commit an error of law or abuse its discretion by terminating Father's parental rights involuntarily, and that Father waived any challenge to the court's decision to change the Children's permanent placement goals to adoption. Therefore, we affirm the termination decrees and the goal-change orders.

Decrees affirmed. Orders affirmed.


*Judgment Entered.*

Joseph D. Seletyn, Esq.
Prothonotary


*Date: 1/29/2020*