J-S22026-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: | : | IN THE SUPERIOR COURT OF |
| D.G., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.B., MOTHER | : | No. 358 MDA 2021 |

Appeal from the Decree Entered February 25, 2021
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 82 Adopt 20, 83 ADOPT 20,
CP-21-DP-00053-2017, CP-21-DP-00054-2017

| | | |
|---|---|---|
| IN RE: ADOPTION OF: | : | IN THE SUPERIOR COURT OF |
| D.B., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.B., MOTHER | : | No. 359 MDA 2021 |

Appeal from the Decree Entered February 25, 2021
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s): 82 ADOPT 20

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| D.G., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF L.B., MOTHER | : | No. 360 MDA 2021 |

Appeal from the Order Entered February 25, 2021
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0054-2017

| | | |
|---|---|---|
| I | : | IN THE SUPERIOR COURT OF |
| N THE INTEREST OF: | : | PENNSYLVANIA |
| D.B., A MINOR | : | |
| | : | |
| | : | |
| APPEAL OF: L.B., MOTHER | : | No. 361 MDA 2021 |

Appeal from the Order Entered February 25, 2021
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s): CP-21-DP-0053-2017

J-S22026-21

BEFORE:   PANELLA, P.J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY McCAFFERY, J.:            **FILED: August 20, 2021**

L.B. (Mother) appeals from the decrees entered in the Cumberland County Court of Common Pleas, which involuntarily terminated her parental rights to her children, D.B. and D.G. (collectively, the Children),[1] pursuant to Subsections 2511(a)(8) and (b) of the Adoption Act.  Mother also appeals from the orders entered that same day, which changed the Children's permanent placement goals from reunification to adoption.  She avers the trial court: (1) failed to properly weigh evidence that she eliminated or was in the process of eliminating the conditions that led to the Children's removal; and (2) failed to properly assess the bond between her and the Children.  After careful review, we affirm the termination decrees and dismiss as moot the appeals from the goal change orders.

D.B., a male, was born in February 2015, and D.G., a female, was born in December 2015.  The trial court summarized that on December 2, 2018, Cumberland County Children and Youth Services (CYS)

> received a referral based on allegations that Mother and [her]
> husband were using heroin[ ], the home was dirty, the children
> had access to needles lying around the home, and the children
> were unclean and unsupervised.  Shortly after the referral, Mother

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 23 Pa.C.S. § 2511(a)(8), (b).  The Children's father, R.G. (Father), consented to adoption for both children, and the trial court voluntarily terminated his parental rights.  Although Father's counsel appeared at the termination hearing, Father does not participate in the present appeal.

- 2 -

tested positive for marijuana and cocaine.  A Safety Plan was put in place on December 8, 2018, with maternal grandmother as the safety plan resource.  [However, Mother had a positive drug screen and failed to abide by the Safety Plan, and there were domestic violence concerns between Mother and her husband.[2]]

On December 31, 2018, a shelter care hearing was held, and the Child[ren were] placed with maternal grandparents as a formal kinship resource.  The Child[ren were] adjudicated dependent at a hearing on January 24, 2019.  . . . Mother tested positive for cocaine on [this] date and her paramour [sic] refused to be tested, but he indicated that it would be positive.

On January 31, 2019, a permanency plan was developed . . . which identified Mother's goals for reunification[.  The plan had] subsequent revisions, each with the primary goal of reunification. . . .

Trial Ct. Op. at 2-3 (record citations omitted and paragraph break added).

For the next two years, Mother's substance abuse remained an ongoing concern.  CYS Caseworker Pricylla Derosier testified that Mother enrolled in two inpatient treatment programs in March 2019 and completed one.  N.T., 2/24/21, at 14.  The caseworker stated she "received a release to obtain documentation of [Mother's] treatment," but when the caseworker "sent the release to Pyramid Health[, she] never received any documentation that the drug and alcohol evaluation was completed."  *Id.* at 14-15.  Mother entered

---

[2] "At the time of [the December 8, 2018,] placement, Father did not have a relationship with the [Children] as there had been a protection from abuse order . . . which prohibited contact between Father and Mother as well as Father and the Child[ren]."  Trial Ct. Op., 4/23/21, at 2.

At this juncture, we note trial court filed four separate opinions — one for each child at each docket number.  The opinions are nearly identical, and thus we cite them as a single opinion for the sake of convenience.

a third treatment program in April 2020 but left two days later, against medical advice. *Id.* at 16. She then moved to New York and reported substance abuse while there. *Id.* at 23. Mother moved back to Pennsylvania in July 2020 and completed a substance abuse evaluation in September 2020, which recommended that she receive outpatient counseling. *Id.* at 16, 23, 44. Mother informed CYS she would participate in intensive outpatient counseling and provided a release for information, but CYS was unable to verify her participation. *Id.* at 16, 27-28, 44-45. Meanwhile, Mother failed to comply with substance abuse screening; between February 2019 and February 2021, she provided only six of a total 131 "opportunities to drug screen." *Id.* at 17.

Meanwhile, the Children underwent assessments for trauma and were diagnosed with post-traumatic stress disorder. N.T. at 36. The assessment also indicated that while the Children were living with Mother, they were victims of psychological, sexual, and physical abuse, as well as "neglect by [the] parents."[3] While living with their maternal grandparents, the Children exhibited "very severe behaviors." *Id.* at 35. For example, they had "a lot of temper tantrums, . . . screaming, . . . yelling[,]" and "a lot of fighting," and "at one point, [one Child was] urinating on the toys and on the floor." *Id.* The maternal grandmother indicated that while she "wanted to serve as a

---

[3] While CYS Caseworker Derosier testified the parents committed **neglect** against the Children, she did not indicate who perpetrated the psychological, sexual, and physical abuse. *See* N.T. at 36.

- 4 -

grandmother role for the children," she was unable to be a permanent resource. *Id.* at 25. *Id.* In May of 2020, the Children began having weekend visits with their current foster family, and in October of 2020, moved in with them. *Id.* at 48-49.

On October 23, 2020, CYS filed petitions for a goal change permanency hearing as to both parents, indicating it intended to also file petitions to terminate their parental rights. On February 10, 2021, CYS filed petitions to involuntarily terminate Mother's parental rights to the Children. The trial court appointed an attorney, as well as a separate guardian *ad litem* (GAL), to represent the Children's legal interests and best interests.

The trial court held a virtual hearing on February 24, 2021. CYS Caseworker Pricylla Derosier testified about Mother's continued substance abuse issues and non-compliance with her goals. CYS also presented the Children's foster mother, P.K., who testified that although the Children initially had "extremely heightened" behaviors, "they have actually died down a lot," and the Children were "much better [than] when they initially started visiting" and "seem to be doing well with structure." N.T. at 49-50. The foster family has had family activities with the Children's maternal grandparents, aunts, and uncles. *Id.* at 52. P.K. testified, however, that at that time she would not want continued contact between the Children and Mother. *Id.* at 52. The children "never mention" Mother, and when "there are upcoming visit with

her," the Children are "triggered," their "behaviors spike," and "they also revert to baby talk." *Id.* at 53.

Mother testified to the following. She has been living in a two-bedroom apartment for the past two months, and for the past four months been employed at two restaurants, for a total of 40 hours per week. N.T. at 62. Mother was earning enough money to support herself and the children. *Id.* at 63. She was participating in intensive outpatient drug and alcohol treatment, "which is four days a week, for two hours a day, and . . . includes counseling." *Id.* at 64. Mother has completed drug and alcohol evaluations, and although Caseworker Derosier claimed she could not obtain verifications, Mother has completed every necessary release. *Id.* at 64-65, 68. Mother acknowledged she did not submit to drug screens, explaining she had an outstanding bench warrant and feared being arrested. *Id.* at 66. The bench warrant was due to "CYS . . . charging [her] child support." *Id.* Mother testified she has never been charged with any abuse against the Children. *Id.* at 69, 73. "The visits always go well," and the Children are excited to see her. *Id.* at 60-61. When the visits are concluding, or when the Children "ask about coming home" or "ask about court," they become upset. *Id.* If the Children were told they could never see Mother again, they would not be alright, and termination of Mother's parental rights would impact the Children "[a]bsolutely negatively." *Id.* at 72.

At the conclusion of the hearing, the trial court announced its decision to change the Children's goals and terminate Mother's rights. The following day, the court entered the underlying goal change orders and termination decrees. On March 24, 2021, Mother timely filed notices of appeal along with Pa.R.A.P. 1925(a)(2) concise statements of errors complained of on appeal.

Mother now presents the following claims for our review:

1. Did the Trial Court abuse its discretion and commit an error of law when it found, despite a lack of clear and convincing evidence, that the [C]hildren's permanency goal of reunification with Mother was neither appropriate nor feasible, and ordered a goal change to adoption, thus contravening Section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f)[?]

2. Did the Trial Court abuse its discretion and commit an error of law in changing the goal to adoption when the conditions which lead to the removal or placement of the [C]hildren no longer existed or were substantially eliminated, thus contravening Section 6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f)[?]

3. Did the Trial Court abuse its discretion and commit an[] error of law when it found, despite a lack of clear and convincing evidence, that sufficient grounds existed for a termination of Mother's parental rights to her children, thus contravening Section 2511(a) of the Adoption Act, 42 Pa.C.S.A. § 2511(a)[?]

4. Did the Trial Court abuse its discretion and commit an error or law in terminating Mother's parental rights when Mother had met or was meeting all her permanency plan goals and the conditions which led to the [C]hildren's removal or placement no longer existed or were substantially eliminated, thus contravening Section 2511(a) and (b) of the Adoption Act, 42 Pa.C.S.A. § 2511(a), (b)[?]

5. Did the Trial Court abuse its discretion and commit an error of law in determining the best interests of the [C]hildren would be served by changing the goal to adoption and terminating parental rights when Mother was ready, willing and able to parent the [C]hildren and provide for their needs, thus contravening Section

6351(f) of the Juvenile Act, 42 Pa.C.S.A. § 6351(f) and Section 2511(b) of the Adoption Act, 42 Pa.C.S.A. § 2511(b)[?]

Mother's Brief at 4-5.[4]

We begin with Mother's challenge to the involuntary termination of her parental rights. The relevant standard of review is as follows:

> In an appeal from an order terminating parental rights, our scope of review is comprehensive: we consider all the evidence presented as well as the trial court's factual findings and legal conclusions. However, our standard of review is narrow: we will reverse the trial court's order only if we conclude that the trial court abused its discretion, made an error of law, or lacked competent evidence to support its findings. The trial judge's decision is entitled to the same deference as a jury verdict.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Section 2511 of the Adoption Act governs involuntary termination of parental rights. *See* 23 Pa.C.S. § 2511. It requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court

---

[4] We note that while Mother includes five claims in her statement of questions involved, she combines them into two argument sections in her brief. *See* Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein[.]"). Nonetheless, because the form of the brief ultimately does not hinder our ability to conduct meaningful appellate review, we decline to dismiss this appeal, and we address her claims on the merits. *See* Pa.R.A.P. 2101 ("[I]f the defects are in the brief . . . of the appellant and are substantial, the appeal or other matter may be quashed or dismissed."); *Krauss v. Trane U.S. Inc.*, 104 A.3d 556, 584 (Pa. Super. 2014) ("When deficiencies in a brief hinder our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived.").

determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (citations omitted).

In this case, the trial court terminated Mother's parental rights pursuant to Subsections 2511(a)(8) and (b),[5] which provide as follows:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition

---

[5] CYS sought termination under Subsections 2511(a)(2), (5), (8), and (b), and Mother presents discussion under all of these. However, the trial court opinion discussed only Subsection 2511(a)(8) and (b) in its opinion.

filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

To satisfy Subsection 2511(a)(8), the petitioner:

must show only (1) that the child has been removed from the care of the parent for at least twelve (12) months; (2) that the conditions which had led to the removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child.  23 Pa.C.S.A. § 2511(a)(8).  Notably, termination under Section 2511(a)(8), does not require an evaluation of [the parent's] willingness or ability to remedy the conditions that led to placement of her children.

*In re Adoption of R.J.S.*, 901 A.2d 502, 511 (Pa. Super. 2006).  In addition, this Court defines the relevant "conditions" somewhat broadly.  *See In re C.L.G.*, 956 A.2d 999, 1003-07 (Pa. Super. 2008) (*en banc*) (concluding a parent failed to remedy her "drug issues," for purposes of Subsection 2511(a)(8), where she was incarcerated for drug offenses after her child entered foster care).  Regarding the third prong, a Subsection 2511(a)(8) needs and welfare analysis is distinct from the Subsection 2511(b) needs and welfare analysis.  *Id.* at 1009.

With respect to subsection 2511(b), we consider whether termination of Mother's parental rights will best serve the child's developmental, physical and emotional needs and welfare.  *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).  "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy

- 10 -

an existing, necessary and beneficial relationship." *Id.* "When conducting a bonding analysis, the [trial] court is not required to use expert testimony. [Instead, s]ocial workers and caseworkers can offer evaluations as well." *Id.* "Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011).

"'Above all else . . . adequate consideration must be given to the needs and welfare of the child.' A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights." *In re Z.P.*, 994 A.2d at 1121. "[A] parent's basic constitutional right to the custody and rearing of. . . her child is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B., N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004).

Here, Mother argues "the [t]rial [c]ourt failed to give proper weight to the evidence of [her] compliance with her family service plan goals and objectives." Mother's Brief at 11. Mother first contends she remedied, or was in the process or remedying, the conditions which led to the Children's removal by completing her service plan objectives. *Id.* at 15-17. Mother maintains that she underwent substance abuse treatment and screening, regularly attended recovery support group meetings, and was clean for 10 months by the time of the hearing. Mother next contends the court's needs and welfare

analysis was inadequate because it did not consider the bond she shares with the Children or the effect severing that bond would have on the Children. *Id.* at 18-19. Mother stresses the court did not order a bonding assessment, and that the Children expressed to their GAL their desire to return to her care. *Id.* at 18. We conclude no relief is due.

Here, the trial court determined CYS satisfied the first prong of Subsection 2511(a)(8), as the Children were removed from Mother's care for 26 months. Trial Ct. Op. at 7. Mother does not challenge this finding.

The trial court further determined CYS satisfied the second prong of Subsection 2511(a)(8), as Mother did not complete her service plan objectives. Trial Ct. Op. at 7-8. The court explained that it found no credible evidence Mother completed a substance abuse evaluation, and that she did not follow through with substance abuse treatment and failed to submit substance abuse screens. *Id.* at 8. We conclude the record supports the court's finding that the conditions which led to the Children's removal continued to exist.

CYS obtained custody of the Children due in part to Mother's positive screen for cocaine, and Mother's substance abuse was CYS's primary concern in this case. N.T. at 12-14. Caseworker Derosier testified Mother enrolled in two substance abuse treatment programs in early 2019, and that she completed the second program in April 2019. *Id.* at 14-15. While Mother reported she completed a substance abuse evaluation at the second program

and signed a release, Ms. Derosier explained she was unable to verify an evaluation had taken place. *Id.* at 15 ("[W]hen I sent the release . . . I never received any documentation that the drug and alcohol evaluation was completed[.]"). Mother was later scheduled to complete a substance abuse evaluation in November 2019, but she failed to do so. *Id.* Mother entered a third substance abuse treatment program in April 2020, but left two days later against medical advice. *Id.* at 16.

Caseworker Derosier further testified that Mother contacted her in May 2020 and informed her she had moved to New York. N.T. at 23. Significantly, Mother admitted she engaged in substance abuse there. *Id.* Mother returned to Pennsylvania in July 2020, and Caseworker Derosier confirmed that she completed a substance abuse evaluation in September 2020, which recommended she receive outpatient counseling. *Id.* at 16, 23, 44. Mother reported she would have intensive outpatient counseling and would submit substance abuse screens through her treatment provider, but Caseworker Derosier was unable to verify Mother's assertions. *Id.* at 16, 27-28, 44-45 ("I had reached out . . . to obtain that information. . . . They had notified me . . . they did not have the signed release. . . but when I had spoken with [Mother] yesterday she had notified me that she had signed a release[.]").

The record indicates Mother also failed to comply with substance abuse screens through CYS' provider. Caseworker Derosier testified Mother initially claimed she was unable to attend screens because of transportation problems

and her work schedule. N.T. at 17. Mother later admitted she did not attend screens because she had an active bench warrant and did not want to be arrested. *Id.* at 17-18. Mother echoed this explanation during her own testimony at the termination hearing, explaining she had a bench warrant due to "CYS . . . charging [her] child support," and she did not attend screens because she feared arrest. *Id.* at 66-67. While Mother testified all of the drug screens she submitted were negative, Caseworker Derosier explained that Mother had 131 opportunities to provide screens at CYS's provider between February 5, 2019, and February 17, 2021, but that she attended only six of those opportunities.[6] *Id.* at 17, 67

We note that with respect to the third prong of Subsection 2511(a)(8), the trial court did not address the Children's needs and welfare separately from the Subsection 2511(b) analysis. However, in its analysis of Subsection 2511(b), the court determined Mother failed to show the stability and capacity necessary to meet the Children's welfare and safety needs. *Id.* at 10. The court acknowledged that a bond exists between Mother and the Children, but found their visits upset the Children and sometimes caused them to engage in inappropriate behaviors, which improved somewhat after the Children moved into their pre-adoptive foster home. *Id.* at 5-6. The court found the

---

[6] Caseworker Derosier also clarified that Mother tested negative twice and "was not able to provide enough specimen" on four occasions. N.T. at 17.

Children appear to feel happy and safe in the home, and emphasized adoption by the foster family would allow the Children to achieve permanency. *Id.* at 5-6, 10-11. We likewise conclude these findings are supported by the record.

At the termination hearing, Caseworker Derosier testified the Children moved to their pre-adoptive foster home in October 2020. N.T. at 25-27. Prior to that, while living with their maternal grandmother, the Children exhibited severe behaviors, including screaming, fighting, and urinating on toys and on the floor. *Id.* at 35. The Children's pre-adoptive foster mother, P.K., testified these behaviors "died down a lot" since they moved into her home. *Id.* at 49. She expressed concern regarding the Children's visits with Mother, however, explaining that seeing Mother is a "trigger" for the Children, and "it takes forever for [the Children] to come back down." *Id.* at 53. Indeed, P.K. testified the Children's behaviors "spike" if they know a visit with Mother is approaching. *Id.* She reported the Children never mention Mother unless someone brings her up, and they do not cry when they leave Mother. *Id.* at 53, 58.

Thus, although the Children have a relationship with Mother, the record supports the trial court's determination that the benefit of permanency through adoption by the foster parents outweighs any harm the Children might suffer because of the severance of that relationship. *See In Re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008) (rejecting the idea that a child maintains a beneficial bond with a parent simply because they harbor affection for the

parent); *In re N.A.M.*, 33 A.3d at 103 (when conducting needs and welfare analysis, a trial court should also consider "the love, comfort, security, and stability the child might have with the foster parent"). Contrary to Mother's arguments, the court did not need to order a bonding assessment before making this determination. *In re Z.P.*, 994 A.2d at 1121; *In Re K.K.R.-S.*, 958 A.2d at 533.

While Mother is correct that the Children expressed a desire to return to her care, we observe that it was their legal counsel, and not their GAL, who reported these sentiments most clearly. *See* N.T. at 88-89. The trial court was not obligated to give the Children's preferences determinative weight, as the Children were five and six years old at the time of the hearingn. *See* 23 Pa.C.S. § 2711(a) ("[C]onsent to an adoption shall be required of . . . [t]he adoptee, if over 12 years of age.").

Further, the Children's legal counsel clarified their views, explaining the Children were confused, that D.G.'s opinions were not well reasoned, and that D.B. appeared to understand that he could not live with Mother and he enjoyed living with the foster family.[7] N.T. at 88-89; *see Interest of D.R.-W.*, 227 A.3d 905, 916 (Pa. Super. 2020) (concluding that it was within the trial court's discretion to afford the child's preference little weight, "given [the child's]

---

[7] Notably, the GAL contradicted the legal counsel's report somewhat, as she indicated D.B. has stated he wants to be adopted. N.T. at 87.

young age, and given that his preference appeared immature and completely at odds with other evidence of record, which established that he had barely even seen [the appellant] for over one year and one-half").

For the foregoing reasons, we discern no abuse of discretion in the trial court's conclusion that CYS has satisfied all three prongs of subsection 2511(a)(8), and we affirm that portion of the termination decrees. We now consider whether the court committed an abuse of discretion pursuant to Subsection 2511(b). *See In re L.M.*, 923 A.2d at 511.

The record supports the trial court's finding that terminating Mother's parental rights will best serve the needs and welfare of the Children. Mother failed to address her ongoing substance abuse issues and demonstrate the ability to provide the Children with appropriate parental care. In addition, although the Children have an established relationship with Mother, the record indicates that this relationship is not healthy for the Children. Visiting Mother upsets the Children and triggers negative behaviors, which include screaming, fighting, and urinating on toys and on the floor. N.T. at 35, 53. The Children moved into a pre-adoptive foster home in October 2020, and their behaviors have improved since that time. *Id.* at 25-27, 49. As the court emphasized, adoption by the foster family will permit the Children to achieve permanency. Trial Ct. Op., 4/23/21, at 10-11. We discern no abuse of discretion, and we affirm the court's termination decrees pursuant to subsection 2511(b).

We finally turn our attention to Mother's first claim on appeal, in which she challenges the change of the Children's permanent placement goals from reunification to adoption. Given our decision to affirm the trial court's termination decrees, any challenge to the goal change orders is moot. *See Interest of D.R.-W.*, 227 A.3d at 917 ("[E]ven if Father had not waived his goal change claim, it would be moot in light of our decision to affirm the court's termination decrees.").

Nonetheless, even reaching the merits of this claim, we would conclude it is meritless. When reviewing a goal change order, this Court adheres to an abuse of discretion standard of review. *Interest of D.R.-W.*, 227 A.3d at 917. We must accept the trial court's factual findings and credibility determinations if the record supports them, but we need not accept the court's inferences or legal conclusions. *Id.*

The Juvenile Act governs goal change proceedings. *See* 42 Pa.C.S. §§ 6301-6375. We have explained the pertinent analysis as follows:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply

- 18 -

cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Mother asserts that in changing the goal, the trial court placed insufficient weight on her compliance with her family service plan objectives. Mother's Brief at 11-13. For the reasons we have already discussed throughout this memorandum, the record confirms changing the Children's goals to adoption would be in their best interest. *See A.B.*, 19 A.3d at 1088-89. Mother failed to remedy the conditions leading to the Children's placement, and the relationship she shares with the Children is not beneficial. The Children need permanency, which they can best achieve through adoption by the foster parents.

Based on the foregoing analysis, we discern no abuse of discretion or error of law in the trial court's decision to terminate Mother's parental rights to the Children involuntarily, and we affirm the February 25, 2021, termination decrees. Because any challenge to the change of the Children's permanent placement goals would be moot given our decision to affirm the decrees, we dismiss the appeals from the February 25, 2021, goal change orders.

Decrees terminating Mother's parental rights affirmed. Appeal from the goal change orders dismissed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 8/20/2021