J-A02010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.I., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 964 WDA 2020 |

Appeal from the Order Entered August 20, 2020
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s):  CP-11-DP-0000003-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: E.I., JR. A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: E.I.., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 965 WDA 2020 |

Appeal from the Order Entered August 20, 2020
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s):  CP-11-DP-0000094-2018

| | | |
|---|---|---|
| IN THE INTEREST OF: U.I., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: E.I., SR., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 966 WDA 2020 |

Appeal from the Order Entered August 20, 2020
In the Court of Common Pleas of Cambria County Domestic Relations at
No(s):  CP-11-DP-0000005-2020

BEFORE: BOWES, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.:                    **FILED: MARCH 12, 2021**

E.I., Sr. ("Father"), appeals from the orders entered August 20, 2020, changing the permanent placement goals of his son, E.I., Jr., born in August 2017, and his twin son and daughter, U.I. and Z.I., born in December 2019.[1] We affirm.

The record reveals that Cambria County Children and Youth Services ("CYS") obtained protective custody of E.I., Jr., on July 26, 2019, prior to the births of U.I. and Z.I. The juvenile court entered an order memorializing E.I., Jr.'s, placement on July 30, 2019, and CYS filed a shelter care application that same day. In its application, CYS averred that Mother left E.I., Jr., under the supervision of an older half-sibling, who threw E.I., Jr.[2] Mother did not seek medical attention for E.I., Jr., resulting in a charge of endangering the welfare of children and a child abuse investigation. CYS further averred that Father was facing a child abuse investigation for allegedly striking and bruising the older half-sibling, and that there were reports of domestic disputes between

---

[1] The juvenile court ruled out B.S. ("Mother") as a placement option as to E.I., Jr., in its first permanency review order entered January 29, 2020, and as to U.I. and Z.I. in the orders of adjudication and disposition entered January 23, 2020. Mother did not appeal the orders ruling her out as a placement option, nor did she appeal the August 20, 2020 goal change orders.

[2] The older half-sibling is not involved in this appeal.

Mother and Father.[3]  CYS filed a dependency petition on August 2, 2019, in which it raised concerns identical to those in the shelter care application.  The court entered a shelter care order on August 5, 2019, and adjudicated E.I., Jr., dependent by order entered August 20, 2019.[4]  The court designated his permanent placement goal as return to parent or guardian.

CYS obtained protective custody of U.I. and Z.I. shortly after their births, and on January 13, 2020, filed petitions for dependency.  As to Father, CYS averred that his home was inappropriate, and that Mother had reported he was drinking heavily and being verbally abusive toward her.  CYS further averred that Father had not completed his court-ordered domestic violence program, and that he was subject to a Protection From Abuse ("PFA") order from January 2019 until July 2019, because of domestic disputes with Mother.  On January 23, 2020, the court adjudicated U.I. and Z.I. dependent and established their permanent placement goals as return to parent or guardian.

Beginning with the adjudication of E.I., Jr., and continuing with the adjudications of U.I. and Z.I., the juvenile court ordered Father to cooperate with service providers and complete certain objectives.  Father's objectives included completing a domestic violence program, submitting to random drug screens, and completing drug and alcohol treatment, among others.  Father

---

[3] Our review of the record does not reveal any indication that CYS ultimately deemed Father a perpetrator of abuse.

[4] The juvenile court docket indicates that it adjudicated E.I., Jr., dependent on one prior occasion, from August 2018 until January 2019.

failed to cooperate with the service providers, and the juvenile court found that he was in minimal compliance with the family service plan and had made minimal progress toward reunification.

On August 13, 2020, the court scheduled a hearing to consider whether to change the permanent placement goals for E.I., Jr., U.I., and Z.I. from return to parent or guardian to adoption. At the conclusion of the hearing, the court announced that it would change the children's goals. It entered goal change orders on August 20, 2020, and Father timely filed separate notices of appeal, as well as concise statements of errors complained of on appeal, on September 14, 2020.

Father presents the following question for our review: "Whether the [juvenile] court erred and/or abused its discretion when it changed the permanency goal[s] for [E.I., Jr., U.I., and Z.I.] from 'Return Home' to 'Adoption.'" Father's brief at 4.[5]

When reviewing an order changing a child's permanent placement goal, this Court applies an abuse of discretion standard of review. *In the Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020). We must accept the juvenile court's factual findings and credibility determinations if the record supports them, but need not accept the court's inferences or legal conclusions. *Id.*

---

[5] Father filed separate appellate briefs for E.I., Jr., U.I., and Z.I., but all three briefs are substantively identical. Thus, we cite them collectively as "Father's brief."

The Juvenile Act governs goal change proceedings. *See* 42 Pa.C.S. §§ 6301-6375. We have explained the pertinent analysis as follows:

> Pursuant to [42 Pa.C.S.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the [juvenile] court. . . .

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa.Super. 2011) (citations and quotation marks omitted).

Father contends that he made sufficient progress for the juvenile court to return E.I., Jr., U.I., and Z.I. to his care, or at least for the court to grant him more time before changing their goals to adoption. Father's brief at 6. Father summarizes the evidence presented during the goal change hearing, asserting that he attended visitation regularly, that his parenting skills were improving, and that he had a "significant" bond with E.I., Jr., U.I., and Z.I. *Id*. at 6-8. Father also asserts that he maintained satisfactory housing and obtained employment. *Id*. at 8. In addition, he highlights the testimony of CYS's expert witness, psychologist Dennis Kashurba, who opined that Father had the potential to succeed as a parent, assuming he maintained sobriety and avoided his dysfunctional relationship with Mother. *Id*.

The juvenile court explained its decision to enter the goal change orders as follows, in relevant part:

> Here, [E.I., Jr., U.I., and Z.I.] have been in the care and custody of [CYS] for a significant period of time (July 2019 for E.I. Jr. and January 2020 for Z.I. and U.I.). [CYS] has an extensive history for services with the family, but Father has made minimal progress in alleviating the conditions necessitating the original placement. This Court is required to provide permanency for [E.I., Jr., U.I., and Z.I.], and Father has not shown a willingness to alter his behavior and provide a safe home for them. Here [CYS] has fulfilled its mandate, and it is time for [E.I., Jr., U.I., and Z.I.] to achieve the permanent and stable family life they deserve.
>
> Finally, the change of a goal from return home to adoption does not terminate Father's parental rights; it is only the first step in the process. As a practical matter, the goal change simply identifies adoption as the favored disposition and relieves CYS from its obligation to continue to provide a parent further services. Father may yet be able to overcome his deficiencies and demonstrate to either this Court at the next review hearing, or to the Orphans' Court at a future termination proceeding, that he is now able to parent [E.I., Jr., U.I., and Z.I.] and that his parental rights should not be terminated. However, the burden of continuing towards that goal now rests with Father and he must obtain the services necessary to reach that goal outside of [CYS]. Accordingly, based on all the evidence produced during this matter the goal change was proper and there is no merit to this allegation of error.

Juvenile Court Opinion, 10/12/20, at 15-16 (citations and footnote omitted).

As Father indicates, CYS presented expert testimony from psychologist, Dennis Kashurba, during the goal change hearing on August 13, 2020. Mr. Kashurba testified that he performed a psychological evaluation of Father on November 14, 2019. N.T., 8/13/20, at 11. Based on this evaluation, Mr. Kashurba opined that Father possessed "adequate or better . . . potential to function as a parent." *Id*. at 15. He tempered this opinion with two caveats.

First, Father would need to avoid reconciliation with Mother, as continuing his relationship with her "would likely result in continued difficulties[.]" *Id*. at 15-16, 19. Second, Father would need to maintain sobriety and avoid a relapse into alcohol or substance abuse. *Id*. at 19. The record confirms that Father failed in both respects.

Regarding Father's relationship with Mother, CYS presented testimony from caseworker Barb Lusczek, who testified that Father was ordered to complete a domestic violence program. *Id*. at 40. However, Father delayed in contacting the program and did not keep his appointments. *Id*. at 46, 50. Ms. Lusczek also reported that CYS continued to receive reports of domestic disputes between Mother and Father. *Id*. at 40. Indeed, twice in the week prior to the goal change hearing, the police were called to address these altercations. *Id*. Mother filed a PFA petition against Father that same week. *Id*.

In addition, Ms. Lusczek testified that Father's alcohol use remained an ongoing concern. She explained that Father was ordered to complete drug and alcohol treatment, but that his treatment program discharged him due to noncompliance, and he had not made any effort to resume treatment. *Id*. at 39-40. Likewise, while Father previously submitted negative drug screens, CYS had not been able to screen Father since March 2020, due to the COVID-19 pandemic. *Id*. at 39.

Ms. Lusczek added that CYS received numerous reports of Father drinking, and that he pled guilty to public drunkenness due to an incident on May 20, 2020, and described a revealing message that Father sent to her three days later. Specifically, she explained that Father mistakenly sent her an early-morning text message indicating that he was inebriated and recently started a relationship with a woman who used drugs.

> . . . . [I] had received a text from [Father] on May 23rd of this year at 2:13 a.m. . . . . The text stated[,] ["]lol, bro, I'm fucked up. I've been drinking all day. I left my baby mom and got a new bitch and she [does meth] wtf[."[6]] And then a second message he sent to me shortly after that said, ["]oops, wrong person.["]

*Id*. Father later claimed to Ms. Lusczek that he had intended to send her this text message, but she did not believe that was true. *Id*. at 45.

Relatedly, CYS presented the testimony of social worker Ashley Shaffer, who testified that she worked with Father to address his decision-making skills, particularly regarding intimate relationships and alcohol dependence. N.T., 8/13/20, at 5-6. Ms. Shaffer reported that Father attended only eight

---

[6] Although the notes of testimony quote Ms. Lusczek as stating that the text read "and she just met wtf" as opposed to "and she does meth wtf," n.t., 8/13/20, at 44, the certified record confirms Father's reference to methamphetamines. A screenshot of the text message reads verbatim:

> Lol bro I'm fucked up I been drinking all day and I left my baby mom and got a new bitch and she **does meth** wtf was I thinking my baby mom only pushed me to be a better father and always stood bye[sic] me and she paid for everything but still said we did it together[.]

N.T., 8/13/20, Petitioner's Exhibit 4 (emphasis added).

of sixteen possible sessions, failed to take responsibility for his poor decisions, and blamed others for his circumstances. *Id*. at 6, 9.

Although Father's relationship with Mother and his alcohol abuse received much of the attention during the goal change hearing, these were not the sole areas of concern. Kathy Scaife, a worker with the IFS Home Management program, testified that Father was evicted from his home. *Id*. at 33. Father did not inform Ms. Scaife until the day of the hearing that he found a new home. *Id*. Ms. Scaife noted that Father was working fewer hours, reportedly due to the COVID-19 pandemic. *Id*. at 34. However, Father's housing issues appeared to predate the onset of the pandemic, as his landlord informed Ms. Scaife that he had not paid rent since December 2019. *Id*.

As the foregoing testimony establishes, the record supports the juvenile court's decision to change the permanent placement goals of his E.I., Jr., U.I., and Z.I. from reunification to adoption. Accordingly, we discern no abuse of discretion. While the evidence indicates that Father has the potential to provide proper parental care and control for his children, he has failed to live up to that potential. He remained in a dysfunctional and belligerent relationship with Mother as recently as a week prior to the goal change hearing. Father's alcohol abuse persists, as demonstrated by his guilty plea to public drunkenness and text message to Ms. Lusczek. In addition to those concerns, Father's housing remained unstable. It was not clear whether he

would be able to maintain his new home, or whether that home was appropriate for the children.

Finally, as to Father's relationship with E.I., Jr., U.I., and Z.I., Father is correct that testimony at the hearing indicated that he shared bonds with the children. However, that testimony consisted of a single sentence from Jeffrey Grove, a family advocate at the Bair Foundation Path House, who supervised Father's visits. Mr. Grove stated, "He does have a bond with the children." *See id*. at 22, 25. Contrary to Father's characterization of this bond as "significant" to the children, the record indicates that Z.I. and U.I. entered foster care in January 2020, shortly after their births in December 2019, and had remained there for eight months by the time of the goal change hearing. E.R., Jr., entered foster care in July 2019, when he was three years old, and remained in placement for over a year by the time of the hearing. Any bond that E.I., Jr., U.I., and Z.I. has with Father under these circumstances is tenuous, and it was within the juvenile court's discretion to conclude that its existence did not outweigh the children's need for permanence and stability, which Father still is unable to provide. *See In re J.D.H.*, 171 A.3d 903, 910 (Pa.Super. 2017) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006)) ("'[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's

need for permanence and stability to a parent's claims of progress and hope for the future.'").

For all of the foregoing reasons, the juvenile court did not abuse its discretion in changing the permanent placement goals of E.I., Jr., U.I., and Z.I. from reunification to adoption.  Hence, we affirm the court's August 20, 2020 orders.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  3/12/2021