J-A13017-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| IN RE: A.C.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: V.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2374 EDA 2021 |

Appeal from the Decree Entered October 25, 2021
In the Court of Common Pleas of Montgomery County Trial Court at
No(s): 2021-A0077

| IN RE: S.J.S., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: V.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2375 EDA 2021 |

Appeal from the Decree Entered October 25, 2021
In the Court of Common Pleas of Montgomery County Trial Court at
No(s): 2021-A0078

BEFORE: OLSON, J., DUBOW, J., and KING, J.

MEMORANDUM BY DUBOW, J.: **FILED JULY 12, 2022**

V.M.S. ("Mother") appeals from the decrees entered on October 22, 2021, by the Court of Common Pleas of Montgomery County, involuntarily terminating her parental rights to S.J.S., born in October 2017, and A.C.S., born in September 2019 (collectively, "Children"). Because the record supports the decision of the trial court, we affirm the decrees.

We glean the following factual and procedural history from the trial court's Opinion and the certified record. In February 2019, Delaware County Children & Youth Services referred its case involving Mother and S.J.S., who was fifteen months old, to Montgomery County Office of Children & Youth ("MCOCY") because Mother was homeless, and suffering from depression and post-traumatic stress disorder. Mother was also pregnant again.

On March 11, 2019, MCOCY obtained an Order for Protective Custody for S.J.S, then seventeen months old, because Mother had untreated mental health issues and no stable housing.[1] MCOCY placed S.J.S. in a pre-adoptive foster home, where he remains today.

The trial court then adjudicated S.J.S dependent. MCOCY provided Mother with goals for reunification in the Family Service Plan, which included obtaining and maintaining stable housing, obtaining mental health evaluations and treatment, maintaining employment, providing evidence of financial stability, visiting with S.J.S., and obtaining appropriate medical treatment.

_____

[1]Mother and S.J.S. had moved five times between January 2019 and March 2019. In early March, Mother and the person with whom Mother had been living had a disagreement and the person asked Mother to move out. Based on Mother's assertion that she could live with her sister in Pittsburgh, MCOCY arranged to transport her to Pittsburgh. While traveling to Pittsburgh, however, Mother informed the caseworker that her sister had moved and that Mother had a place in a shelter in Pittsburgh instead. The case worker determined that Mother did not have a place in the shelter and returned Mother and S.J.S. to Montgomery County. MCOCY arranged housing for Mother and S.J.S. for the weekend.

MCOCY provided services to Mother through three different agencies to assist her in meeting her Family Service Plans goals.

In April 2019, Mother underwent a psychiatric evaluation with Central Behavioral Health ("CBH").  CBH concluded that at that time, that Mother did not need in-patient mental health treatment or medication but indicated that Mother may benefit from outpatient therapy.  MCOCY discussed the evaluation with Mother and told her that she should enroll in outpatient therapy.

At this time, Mother was living with a family member in Norristown.  She later moved out of the family member's residence and refused to give MCOCY the address of where she was staying.

In May 2019, MCOCY referred Mother to Carson Valley Children's Aid for reunification services.  In June 2019, Mother obtained a three-bedroom apartment along with her mother and her mother's boyfriend.

In September 2019, Mother gave birth to A.C.S.  Because Mother was making some progress on her reunification goals, MCOCY did not immediately seek an Order for Protective Custody for A.C.S.

In November 2019, however, Mother's landlord evicted her for non-payment of rent and utilities.  Mother and A.C.S, who was then nine weeks old, first stayed with a friend, but MCOCY informed Mother that A.C.S. could not stay there because the individuals living there had a history of criminal and child welfare offenses.  Mother then sent A.C.S. to her sister's house in

Philadelphia for the weekend, but her sister would not permit Mother to stay with her due to past problems between them. *Id.*

On November 18, 2019, Mother and A.C.S. moved into the home of a family friend, Ms. Foster, in Philadelphia.[2] While Mother lived with Ms. Foster, Mother's stability improved and the trial court concluded that Mother had made moderate progress toward meeting her Family Service Plan objectives. In February 2020, due to Mother's progress, the trial court permitted Mother to have overnight and unsupervised visits with S.J.S. at Ms. Foster's home. In March 2020, however, due to the COVID-19 pandemic, Mother's visits with S.J.S. occurred virtually.

On June 29, 2020, after a hearing, the trial court denied MCOCY's request for reunification after finding that, although Mother had obtained a part-time job, she had not yet established stable housing and needed to produce a lease agreement.

In July 2020, Mother allowed Ms. Foster's unlicensed teenage son to use Mother's car to drive her and A.C.S., who was then ten months old. Mother had just purchased the car, but the car needed brakes and had not passed inspection. Ms. Foster's teenage son drove the car into a guardrail on an expressway. The car flipped over several times and Ms. Foster's son went

---

[2] Carson Valley Children's Aid terminated its services when Mother moved to Philadelphia. MCOCY attempted to refer Mother to reunification services in Philadelphia, but there was no agency available to provide services.

through the windshield. *Id.* Mother suffered numerous broken bones and A.C.S. suffered bruising. *Id.*

Following the accident, Ms. Foster evicted Mother and Mother moved into a family member's home in Philadelphia. However, MCOCY deemed the situation in the house to be unsafe for A.C.S. to live in because of unsanitary conditions and Mother's refusal to provide MCOCY with the names of all of the adults in the home. MCOCY placed A.C.S. with Ms. Foster with a safety plan.

MCOCY then filed a Dependency Petition for A.C.S. At this point, MCOCY's concerns about Mother's parenting ability included Mother's display of poor judgment by permitting an unlicensed driver to transport her and A.C.S. inside an unsafe vehicle, continual instability with housing and employment, her failure to obtain mental health treatment, and her failure to follow up with medical care.

On September 10, 2020, after a hearing, the trial court adjudicated A.C.S. dependent based upon lack of appropriate parental care and control and placed A.C.S. with the same foster family as S.J.S. MCOCY learned at the hearing that Mother had moved again, this time to her sister's home in Coatesville. The trial court ordered Mother to obtain an updated psychological and psychiatric evaluation.

At the December 2020 permanency review hearing, Mother informed the court and MCOCY that she had moved again and was renting a bedroom in a boarding house in Philadelphia. Mother stayed at the boarding house for

only a few weeks before she started sub-letting one bedroom of a three-bedroom apartment in Philadelphia.

In May 2021, Mother provided MCOCY with the address of her most recent residence but did not permit MCOCY to view the home until August 2021. When MCOCY asked her to provide a written lease, Mother provided a handwritten, post-dated document by the tenant of the apartment, who stated he was permitting Mother to rent one of the three bedrooms.

On May 10, 2021, Psychologist Steven Miksic conducted a parenting capacity evaluation of Mother, after which he concluded Mother suffered from severe depression and other emotional difficulties that prevented her from sustaining her own self-care and rendered her incapable of parenting the Children. He provided six recommendations, which included that Mother obtain psychiatric and psychological therapy to address her childhood trauma, behavioral issues, and poor judgment; cooperate with child welfare agencies; maintain consistent contact with Children; and obtain stable and independent housing and financial resources. *See* MCOCY Exh. 15, Parental Capacity Evaluation, 5/29/21.

On May 28, 2021, MCOCY filed petitions to involuntarily terminate Mother's parental rights to Children.[3] The trial court held hearings on the

---

[3] On July 23, 2021, Mother gave birth to another child who is not a subject of these proceedings. Mother did not tell the Children, MCOCY or Dr. Miksic that she was pregnant and instead showed up at a visit with the Children with the
*(Footnote Continued Next Page)*

- 6 -

petitions on October 14, 2021, and October 22, 2021, when the Children were two and four years old.[4] MCOCY presented the testimony of Delaware County Children & Youth Services intake supervisor, Maria Archdeacon; Open Door International caseworker Kelly Anne Toepel; MCOCY caseworker, Reginald Nelson; and psychologist, Stephen Miksic, Ph.D.

Ms. Toepel testified about Mother's interactions with the Children, noting that Mother struggled during both virtual and in-person visits. N.T. Termination, 10/22/21, at 29, 33-50. Mother rarely displayed affection and excitement when she saw Children, instead appearing without affect and "almost no expression." *Id.* at 33. At times, S.J.S. made comments indicating that he noticed that Mother did not put forth effort to engage with him. *Id.* at 37. Mother took at least one FaceTime call during every visit. *Id.* at 38, 48. Ms. Toepel recalled one instance where she had to tell Mother to end her call to help S.J.S. on the playground. *Id.* at 38. S.J.S. often seemed uncomfortable during visits, especially during the virtual visits where Mother disappeared from camera view or fell asleep during visits. *Id.* at 42. Ms. Toepel also described an incident where Mother got upset with S.J.S. when he

_____

baby without preparing them. *See* Tr. Ct. Op., dated 1/14/22, at 8. Mother's youngest child was not part of these proceedings and is not a subject of this appeal. Thus, this court has no information about whether the newborn child remains in Mother's care.

[4] Due to Children's young ages, Sara Hentschke, Esquire, represented Children in a dual role as legal counsel and guardian *ad litem*.

called her by her first name, and she retaliated by focusing more attention on A.C.S. *Id.* at 39-43. Mother also was not consistent in visiting with Children; overall, from the time A.C.S. came into foster care in October 2020, Mother attended 31 out of 47 visits. *Id.* at 57.

Dr. Miksic testified extensively regarding the Parenting Capacity Evaluation of Mother, concluding that Mother suffered from several untreated mental health disorders, and that if Mother did not take the actions that he recommended, her "difficulties with functional capacity in many areas that are basic to self-care and independence, as well as caring for children, would persist." N.T., 10/14/21, at 76. He also opined that if her failure to obtain treatment was based upon an unwillingness to obtain treatment or perception that she did not need treatment, her ability to care for herself and to parent "would be persistent for a long period of time." *Id*. at 76-77.

The only evidence that Mother presented was her own testimony.

At the conclusion of the testimony, the trial court granted MCOCY's petitions. The court entered decrees memorializing its decision on October 25, 2021, citing 23 Pa.C.S. § 2511(a)(1), (2), (5), and (b) in the decree pertaining to A.C.S., and 23 Pa.C.S. § 2511(a)(1), (2), (8), and (b) in the decree pertaining to S.J.S. Thereafter, Mother filed timely Notices of Appeal and Concise Statements of Errors Complained of on Appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

- 8 -

In her brief, Mother raises four issues challenging the trial court's termination of her parental rights. **See** Mother's Br. at 4.[5]

## A.

Our standard of review is well settled. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." **In re Adoption of C.M.**, 255 A.3d 343, 358 (Pa. 2021). Appellate courts must accept the trial court's findings of fact and credibility determinations if the record supports them. **Interest of S.K.L.R.**, 256 A.3d 1108, 1123 (Pa. 2021). An appellate court may disturb a ruling supported by competent evidence in the record only upon discernment of an error of law or abuse of discretion. **In re Adoption of L.A.K.**, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support

---

[5] Mother also purports to challenge an alleged evidentiary ruling that rejected evidence of kinship care as a viable alternative to termination. **See** Mother's Br. at 4, 27-28. Although she cites to a "Praecipe, p. 27" and "Hearing transcript p 25," Mother does not indicate when or how she asked the trial court to consider this evidence and where in the record the court issued a ruling declining to consider it. These failures fatally hamper our review of this issue, and it is, thus, waived. **See** Pa.R.A.P. 2117(a)(4), (c)(4), and Pa.R.A.P. 2119(c) (requiring reference to the place in the record where the matter referred to appears). **See also** Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal").

an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

When addressing a petition to involuntarily terminate parental rights, the Adoption Act requires the trial court to conduct a bifurcated analysis. *See* 23 Pa.C.S. § 2511(a) and (b). "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *In re Adoption of C.M.*, 255 A.3d at 359; *see also* 23 Pa.C.S. § 2511(a)(1)-(11). If the trial court determines that the petitioner established grounds for termination under subsection 2511(a) by clear and convincing evidence, the court must then assess the petition under subsection 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); 23 Pa.C.S. § 2511(b).

**B.**

While the trial court here found that MCOCY met its burden of proof under multiple subsections of 23 Pa.C.S. § 2511(a), we need only agree with the court's decision as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

- 10 -

We focus our analysis on Section 2511(a)(2), which provides that a parent's right to her child may be terminated where "[t]he repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent." 23 Pa.C.S. § 2511(a)(2). **See also Interest of D.R.-W.**, 227 A.3d 905, 912-13 (Pa. Super. 2020) (reiterating the three elements contained with Section 2511(a)(2).

Grounds for termination under subsection (a)(2) include more than affirmative misconduct and acts of refusal; it also includes parental incapacity. **In re Adoption of A.H.**, 247 A.3d 439, 443 (Pa. Super. 2021). Thus, sincere efforts to perform parental duties may still be insufficient to remedy an incapacity. **In re Z.P.**, 994 A.2d at 1117. This is because subsection (a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." **Id.**

"Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." **In re Adoption of A.H.**, 247 A.3d at 443. A "parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may

properly be rejected as untimely or disingenuous." *In re Z.P.*, 994 A.2d at 1118.

Additionally, "[p]arental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of [her] ... ability, even in difficult circumstances." *Id*. (citation omitted). "Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with the child's physical and emotional needs." *Id*. (citation, emphasis omitted).

Here, the trial court made the following findings about Mother that led to her inability to parent the Children: Mother's inability to maintain stable housing suitable for the children prior to and after Children were adjudicated dependent and placed in foster care, "chronic unemployment," lack of "understanding and resources to provide for [the children's] basic needs," her "untreated psychiatric disorders of Depression and Post Traumatic Stress," and her failure "to obtain court-ordered mental health evaluations." Trial Ct. Op. at 13-14.

In finding that MCOCY met its burden with respect to Section 2511(a)(2), the trial court found persuasive and credible the testimony of Dr. Miksic who concluded that Mother lacked the capacity to parent the Children for the following reasons:

> Dr. Miksic conducted a Parenting Capacity Evaluation of Mother on May 20, 2021. In his expert Opinion, which this Court found to

be credible, he opined that Mother was not capable of parenting two children. *See* N.T., 10/14/21, at 75; Exh. 15. Dr. Miksic diagnosed Mother with Major Depressive Disorder with possible Post-Traumatic Stress Disorder, and requires treatment and evaluation for medication, in order to gain the capability to care for the children. *Id*. at 74. Mother's failure to obtain the court-ordered psychological and psychiatric evaluations, obtain and maintain stable housing, financial resources, and engage in a nurturing and loving relationship with the children demonstrated her repeated and continued incapacity that has left the children without the proper parental care. Mother suffers from untreated psychiatric disorders that persist without any treatment and/or medication. She receives monthly social security benefits for Post-Traumatic Stress Disorder but does not engage in any therapeutic services and/or medication management.

Trial Ct. Op, at 13-14, 17.

Our review of the record demonstrates that the record supports the trial court's finding of Mother's incapacity to parent the Children.

Mother challenges to the trial court's termination of her parental rights are, in essence, challenges to the weight, or in other words the persuasiveness that the trial court placed on the evidence, including Dr. Miksic's testimony and report. In particular, Mother argues that the trial court erred in relying on Dr. Miksic's testimony because Dr. Miksic did not observe Mother with Children. Mother's Br. at 16.[6] This is an argument about the weight the trial

---

[6] Mother also contends that MCOCY "signed" the petition to terminate one month prior to the evaluation and that Dr. Miksic thus "conformed" his report to the allegations in the petition, and implying that he did so to ensure further engagements with MCOCY. *Id*. at 18. Mother's counsel cross-examined Dr. Miksic regarding his financial arrangement with MCOCY , and it was within the court's discretion to reject Mother's insinuations that Dr. Miksic was biased
*(Footnote Continued Next Page)*

court placed on Dr. Miksic's testimony; it does not disqualify his expert opinion and thus, Dr. Miksic's testimony is part of the record and we must affirm the trial court's finding. To accept Mother's argument would require us to re-weigh the evidence, a procedure that we cannot and will not do.

Mother also argues that the trial court erred in relying on Dr. Miksic's testimony because Dr. Miksic in his report included a statement that "tangible progress towards stable recovery and functional capacity should be established within six months to indicate a reasonable likelihood of parental capacity." **Id** at 17. Once again, Mother is arguing that the trial court erred in relying on Dr. Miksic's report because of the recommendation. The trial court, however, properly accepted Dr. Miksic's report into evidence and this argument again focuses on the weight the trial court gave the report. The trial court was free to reject that statement and still conclude that the rest of the report was sufficiently persuasive to conclude that Mother lacked the capacity to parent the Children. Once again, we cannot re-weigh the evidence and we reject Mother's argument.

In sum, the record supports the trial court's conclusion that Mother lacks the capacity to parent the Children and MCOCY met its burden under 2511(a)(2). Two years and seven months after S.J.S. entered foster care,

_____

and still place weight on Dr. Miksic's conclusions. We will not re-weigh the evidence.

Mother still struggled with her own mental health and psychological instability, which negatively impacted her parenting and ability to provide stability for Children. Since MCOCY removed S.J.S. from Mother's care in March 2019, Mother has moved seven times, often losing housing due to conflicts with others. While she had remained in the same housing from sometime in the beginning of 2021 until the last hearing in October 2021, her housing consists of one bedroom dependent on her relationship with the tenant, akin to situations where she has struggled historically. Moreover, throughout the life of this case, Mother has never obtained mental health care, and her transience made it difficult for her to work with services. Given how little progress she has made overall, the trial court was within its discretion to conclude that Mother lacks the ability to parent the Children and is unable to remedy the causes of her incapacity.[7]

_____

[7] While ordinarily we would turn to Section 2511(b) at this juncture, the only issue regarding Section 2511(b) that Mother preserved in her concise statement and presents in her brief is whether the Trial Court erred by addressing Section 2511(b) when MCOCY failed to prove grounds under Section 2511(a). Having affirmed the decision of the trial court with respect to Section 2511(a), Mother's Section 2511(b) argument is meritless. Moreover, we note that the trial court determined that Children have a minimal bond with Mother and severing that bond serves their needs and welfare. Trial Ct. Op., 1/14/22, at 21-23. The record supports these findings and the trial court did not abuse its discretion by concluding that terminating Mother's parental rights met Children's needs and welfare.

## C.

Our review of the record supports the trial court's findings. We do not discern an error of law or abuse of discretion with respect to the court's decision to terminate Mother's parental rights. Thus, we affirm the decrees terminating Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/12/2022