J-A11021-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: D.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.G.H., MOTHER | : | |
| | : | |
| | : | No. 1725 MDA 2025 |

Appeal from the Decree Entered November 14, 2025
In the Court of Common Pleas of Cumberland County Orphans' Court at
No(s):  058-adopt-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: D.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: N.G.H., MOTHER | : | |
| | : | |
| | : | No. 1748 MDA 2025 |

Appeal from the Order Entered November 19, 2025
In the Court of Common Pleas of Cumberland County Juvenile Division at
No(s):  CP-21-DP-0000026-2025

BEFORE:  BECK, J., NEUMAN, J., and BENDER, P.J.E.

MEMORANDUM BY NEUMAN, J.:                    **FILED: MAY 29, 2026**

Appellant, N.G.H. (Mother), appeals from the order and decree entered in the Court of Common Pleas of Cumberland County (trial court) changing the permanency goal from reunification to adoption and involuntarily

terminating her parental rights to her daughter, D.H. (born January 2025).[1]

In addition, Mother's counsel, Robert Harold Hawn, Jr., has filed an application

to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738

(1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa. 2009).[2]  We

grant Attorney Hawn's application to withdraw, affirm the termination decree,

and dismiss Mother's appeal from the goal change order as moot.

## Background

We glean the following background from the certified record.  Shortly

after Mother gave birth to Child in January 2025, Cumberland County Children

and Youth Services (CYS) received a general protective service referral which

reported substance use concerns by Mother, homelessness, and a child born

affected by substance.  N.T., 11/14/25, at 15.[3]  Ultimately, Child was

discharged from the hospital with Mother.  **Id.** at 18.  On February 5, 2025, a

supplemental report came into CYS about a post on social media where Mother

---

[1] The order and the decree are both dated November 14, 2025.  After Mother filed separate notices of appeal from each, we *sua sponte* consolidated Mother's appeals.  **See** Pa.R.A.P. 513 (addressing consolidation of multiple appeals).

[2] **See also In re J.D.H.**, 171 A.3d 903, 905 (Pa. Super. 2017) (observing this Court has extended the **Anders** procedure to appeals from decrees involuntarily terminating parental rights and has routinely applied the **Anders** procedure to appeals from goal change orders where the appellant also is appealing from an involuntary termination decree) (citing **In re V.E.**, 611 A.2d 1267 (Pa. Super. 1992)).

[3] Child's father is unknown.  N.T. at 20-21.  His parental rights to Child were involuntarily terminated on the same day as Mother's parental rights.

appeared angry and under the influence, and said she was "going to get someone." *Id.* CYS made an unannounced visit to Mother's home to follow up on that report, and Mother was found to be slurring her words and exhibiting erratic behavior while holding Child. *Id.* Mother's home was also dirty and not furnished. *Id.* When asked to provide a drug screen, Mother could not produce a specimen for it. *Id.*; *see also generally* CYS Exhibit #1 OC (Application for Emergency Protective Custody, 2/6/25).

That same day, on February 5, 2025, the trial court issued a verbal order — which was later reduced to writing — granting CYS legal and physical custody of Child. *See* N.T. at 19; CYS Exhibit #1 OC (Confirmation of Verbal Order for Emergency Protective Custody, 2/7/25). Notably, Mother has previously had her parental rights involuntarily terminated to two other children, in 2017 and 2022, respectively. N.T. at 15-17; *see also* CYS Exhibit #12 OC (Dauphin County Termination Decrees).[4] These children were adopted by different families. N.T. at 16-17. Child was initially placed in a traditional foster home as she could not be placed at that time in the kinship resource home of one of the families who had adopted a biological half-sibling. *Id.* at 19-20; CYS Exhibit #1 OC (Confirmation of Verbal Order for Emergency Protective Custody, 2/7/25, at 2). CYS subsequently provided sufficient

---

[4] This Court affirmed these termination decrees. *See Interest of S.H.*, 284 A.3d 886 (Pa. Super. 2022) (unpublished memorandum); *Matter of J.R.H.*, 188 A.3d 514 (Pa. Super. 2018) (unpublished memorandum).

testimony at a shelter care hearing to sustain shelter care placement.  *See* CYS Exhibit #1 OC (Recommendation for Shelter Care, 2/11/25).

The trial court adjudicated Child dependent effective February 18, 2025. *See* CYS Exhibit #1 OC (Recommendation for Adjudication, 2/24/25, at 3). At the adjudicatory hearing, it was undisputed Mother has a history of substance abuse, used substances during her pregnancy prior to learning she was pregnant, and sought intensive treatment prior to Child's birth.  *Id.* at 1. It was also undisputed that Mother has mental health diagnoses and requires related treatment including medication management.  *Id.*  Further, while the trial court found aggravated circumstances based on the previous involuntary termination of Mother's parental rights, CYS did not ask to be relieved of the expectation it make reasonable efforts to reunify Child with Mother.  *See id.* at 3.  The placement goal was for Child to return to parent or guardian and, if Child remained in care following the dispositional hearing, adoption as the concurrent goal.  *See id.*

At the subsequent dispositional hearing on March 10, 2025, the parties contested whether Mother's natural supports and substance abuse interventions were sufficient to allow her and Child to be safe in the home together.  CYS Exhibit #1 OC (Recommendation for Disposition, 3/13/25, at 2).  Among other things, the trial court found:

> [CYS was] able to verify many of the positive reports [Mother] made regarding her connection to services including Nurse Family Partnership, a Certified Recovery Support Specialist, and mental health medication management.  Some of the services are newly in place.  Some, such as parenting assessment through

Alternative Behavior Consultants (ABC), have not yet been completed. Some services have not yet begun, such as outpatient drug and alcohol treatment. All of them are important. [Mother] appears to be cooperative and committed to positioning herself to care for [C]hild. She does not seem to appreciate the relevance of her history of abuse or involuntary termination of parental rights. Her Certified Recovery Specialist agreed that to protect her sobriety, she must refrain from use of all non-medicinal substances. [Mother] did not dispute the drug screen results provided just before the hearing which were positive for alcohol.

\*\*\*

In addition to mental health and child specific parenting goals, planning will need to ensure stability of housing, offer opportunities for [Mother] to demonstrate sobriety, and continue to offer ways for kin to be rallied in support of [Child] and [Mother].

*Id.* at 2. The trial court directed Child to remain in the legal and physical custody of CYS for continued placement in Child's current foster home until a transition to the kinship resource home of one of the families that adopted Child's biological half-siblings could be implemented. *Id.* On March 18, 2025, Child was placed in the kinship caregiving home of her biological half-sibling's adoptive parents (hereinafter Foster Parents/Foster Mother/Foster Father). CYS Exhibit #1 OC (Order Regarding Modification of Child's Placement, 3/26/25).

CYS prepared a Child Permanency Plan (CPP). The CPP required Mother, *inter alia*, to: attend all medical appointments for Child and, if unable to attend appointments, request updates from the Foster Parents and/or doctor's office; maintain employment and appropriate housing for herself and Child and pay rent/bills in a timely manner; participate in a drug and alcohol evaluation and follow all recommendations of the evaluation; refrain from using illegal drugs

- 5 -

and take medication only as prescribed; participate in Restorative Sanctions drug screening; participate in a mental health evaluation and follow all recommendations of the evaluation; participate in a FAST parenting assessment and follow recommendations of the assessment; attend all visits with Child as scheduled; and maintain contact with her CYS caseworker. CYS Exhibit #1 JUV (CPP at 11-15, 17).

According to Andee Warner, director of services at ABC, Mother was referred for a FAST parenting assessment in March 2025. N.T. at 11, 12. Mother scheduled two initial appointments and "no-showed" for both, so she "was closed out." *Id.* at 12. Mother "was referred again in April of 2025, scheduled two initial appointments, no-showed for both, and was closed out." *Id.* With respect to visitation, Mother was referred for visitation at ABC and "no-showed for her initial orientation and then came to an orientation and then was offered five visits and attended three. And it was every other." *Id.* at 13. Ms. Warner said when Mother "no-showed the last time[,] the visitation coordinator reached out to [Mother] because we needed to have an attendance meeting. She didn't answer the visitation coordinator. We sent a 10-day letter[ on May 31, 2025]. She didn't respond to that. So she was closed out from visitation [on June 12, 2025.]" *Id.* Outside of visitation at ABC, Sandy Gibson — the CYS caseworker involved in Mother's case — noted Foster Mother met with Mother once "in the community in April [2025] and provided a visit with" Child. *See id.* at 21; *see also id.* at 14.

A judicial conference was scheduled for May 5, 2025, but did not occur because Mother did not attend. CYS Exhibit #1 OC (Recommendation-Judicial Conference Report, 5/9/25). A permanency review hearing was set for August 22, 2025. *Id.*

In June 2025, Mother lost her housing after she failed to pay her highly subsidized rent and her landlord received reports of roaches and smells coming from Mother's apartment. *See* N.T. 26-27. Thereafter, Ms. Gibson lost contact with Mother from June 24, 2025 until September 2, 2025, despite Ms. Gibson's many efforts to reach Mother during that time. *Id.* at 27-30. Ms. Gibson explained she checked with the Foster Parents, Mother's friends, the Pennsylvania Psychiatric Institute, and the Mechanicsburg Police Department, but nobody had heard from Mother. *Id.* at 28-29. However, when Ms. Gibson eventually contacted the Harrisburg City Police, she recalled:

> I did get information that [Mother] was involved in an incident on July 29th at Vernon and 13th Street where she reported someone threw a brick at her. The police had given me two phone numbers to call that [Mother] had provided. So I called those numbers. The one number was not in service. The other number I did leave a message, but it was someone else's name who was on the message.
>
> I continued to call the numbers. I continued to call the friends. The friends were getting very nervous because they know [Mother] posts a lot on social media and they had not seen anything. So they were worried that something may have happened to her. I called the Mechanicsburg Police again.
>
> Now we're kind of at the mid-end of all of this. I called Mechanicsburg Police, no reports. I called Harrisburg City again. I was told that [Mother] was actually involved in two traffic stops in August around 17th Street and Paxton Street in Harrisburg.

They gave me the address that [Mother] had given them. And the phone numbers were the same as before.

So I did go to that address, which was on the Messiah campus in Dillsburg. I didn't understand it, but I went. I knocked on the door. No one answered. It looked like student housing. That was the last efforts that I made until [Mother] then surfaced on September 2nd.

*Id.* at 29-30.

Mother, in the meantime, did not attend the August 22, 2025 permanency review hearing. CYS Exhibit #1 OC (Permanency Review Order, 8/27/25, at 3). The trial court noted no one on the case could find or get a response from Mother. *Id.* The trial court found:

There has been no compliance with [the] permanency plan, in that [Mother] was unsuccessfully discharged from drug and alcohol treatment due to non-compliance. She did not consistently test through Restorative Sanctions Program and was discharged from that program for non-compliance. She has not sought mental health treatment. She does not have housing. She has not completed the FAST parenting assessment. She is not visiting with [Child,] nor is she maintaining any type of regular contact with her. Most recently, she has not communicated with the caseworker and her whereabouts are unknown. [Mother] has continued to express a desire to reunify with her daughter.

*Id.* at 1. The permanent placement goal remained return to parent or guardian, with a concurrent placement plan of adoption. *Id.* at 2.

On September 2, 2025, Mother reached out to Ms. Gibson through text. N.T. at 30. She told Ms. Gibson she was staying at the YWCA in Harrisburg and wanted to see Child. *Id.* Mother also told Ms. Gibson that she "was being sex trafficked during [the time she was missing]; that she was kidnapped; that she was held in a basement; and that she was drugged. She reported

that she was taken to motels and forced to have sex." *Id.* at 25. Ms. Gibson explained:

> So when I did speak with [Mother,] she was adamant that she could not get away from these traffickers. … I said, well, couldn't you have called me or called somebody, called the police. She kept reporting that she had no opportunity to do that; that she was being held captive.
>
> So … I spoke to Officer Nathan Carr of the Harrisburg City [Police] who did the one traffic stop on the 18th of August because I did receive the incident report. And in the incident report[,] it noted … she was in the vehicle with two men. And [Officer Carr] asked her to step out of the vehicle and talk to him and she did.
>
> And they went to[,] I think[,] the front of the vehicle and had a conversation. They found drugs in the vehicle. She denied that they were hers. The passenger denied that they were his. They ended up arresting the driver and took him to jail.
>
> But at the time when Officer Carr was speaking to [Mother,] she reported that there was too much drama going on in the city and she had gotten into a fight with another woman and she wanted to get out of the city and she was catching a ride with these two guys to leave town. And that's what she reported.
>
> When I asked Officer Carr[,] I said[,] do you remember did she experience any fear of being with these men or needing help and he said, no, she seemed perfectly fine with these men. And when the driver was taken to jail, it was the passenger['s] car. So he left and [Mother] left with him in that car.

*Id.* at 30-31. Ms. Gibson also noted, when she spoke to Mother's case manager from her other previous two termination cases about Mother's being missing, the case manager commented it "sounds very familiar; … she heard that same story when [Mother] was working with" her. *Id.* at 25. Ms. Gibson admitted she was skeptical about Mother's account. *Id.* at 45. When asked if the police are investigating the alleged kidnapping, Ms. Gibson said Mother

"was not able to identify names. She told the police if she remembers anything more[,] she would get back to them. But … they had nothing on record that she reported anything back…." *Id.* at 64.

On September 16, 2025, CYS filed a petition for a goal change to adoption permanency hearing and, on October 17, 2025, CYS filed a petition for involuntary termination of Mother's parental rights pursuant to Sections 2511(a)(1), (2), (5), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[5] A hearing on both petitions was held on November 14, 2025. At the hearing, CYS called Ms. Warner; Ms. Gibson; and Child's Foster Mother to testify. Although Mother had notice of the hearing, she inexplicably did not attend the hearing either in-person or by video. Attorney Hawn, however, was present and called no witnesses.

Ms. Warner testified at the hearing that Mother was referred again for a FAST parenting assessment at the end of September 2025. N.T. at 12. While Mother attended the initial triage appointment and the meeting with the evaluator, Ms. Warner said Mother "has since scheduled two observations with [Child] and no-showed for both as recently as last night. And so the FAST [parenting assessment] was not able to be completed." *Id.*

Further, Ms. Gibson testified that, starting at the end of September 2025 until November 7, 2025, she offered Mother visits with Child at a local Burger

---

[5] While Child already had a guardian *ad litem* (GAL) in the dependency proceedings, the court appointed Child the same GAL for the termination proceedings as well as separate legal counsel.

- 10 -

King on a weekly basis due to Mother's limited transportation, and five approximately one-hour visits took place with Foster Mother and Ms. Gibson present. *See id.* at 22-24; *see also id.* at 74. Prior to that, Ms. Gibson said Mother had not seen Child since April 2025. *Id.* at 24. Ms. Gibson reported "the very first visit…[, Child] really reacted negatively. She was crying, reaching for [Foster Mother], didn't want to go to [Mother], but eventually she did. And the visits were okay. [W]e sat at a booth and [Mother] would feed [Child] and play with her." *Id.* at 24. Ms. Gibson said she thought a bond between Mother and Child was "growing a little bit." *Id.* at 60.

At the time of the hearing, Ms. Gibson also relayed Mother is still living at the YWCA and is involved in its human trafficking program, but noted it is only a 90-day program and Child cannot be placed at the YWCA. *Id.* at 31-32, 68. Consequently, Mother was actively looking to find other housing. *Id.* at 32, 43-44.

With respect to drug and alcohol treatment for Mother, Ms. Gibson said Mother "had been working with Gaudenzia West Shore prior to be[ing] missing in June[,] and she reconnected with Gaudenzia West Shore when she returned." *Id.* at 25; *see also id.* at 33. Ms. Gibson indicated Mother participated in a drug and alcohol evaluation at Gaudenzia West Shore on October 8, 2025, and has been regularly attending outpatient treatment there two times a week for one-and-a-half hours since then. *Id.* at 33, 53. While a drug test was attempted at Gaudenzia West Shore, Mother could not produce a specimen. *Id.* at 34. As a result, Ms. Gibson said she was not sure whether

Mother is currently using drugs or alcohol. *See id.* Further, Ms. Gibson said Mother was "directed to get a certified recovery specialist" and has gone through several attempts. *Id.* at 35. Ms. Gibson recalled Mother was working with a certified recovery specialist for about a month in February 2025 when she stopped contact; she subsequently had an intake appointment scheduled with a different certified recovery specialist in June 2025 but did not show up to the appointment; and she recently met with a certified recovery specialist twice in October 2025. *Id.* at 35. In addition, while Mother told Ms. Gibson she was planning to meet with a psychiatrist the day before the hearing, Ms. Gibson could not confirm the appointment occurred. *Id.* at 34. Ms. Gibson noted Mother has been diagnosed with bipolar and schizoaffective disorders. *Id.* at 42. Ms. Gibson conveyed that she requested a psychological evaluation to be incorporated with the FAST assessment, but Mother failed to complete the FAST assessment. *See id.* at 57. As far as employment, at the time of the hearing, Ms. Gibson reported Mother did not have consistent employment. *Id.* at 37. When asked by Attorney Hawn if giving Mother five more months to work toward reunification would make a difference, Ms. Gibson answered she did not think so. *Id.* at 55-56.

Ms. Gibson conveyed she visits Child every six weeks or so in her foster home. *Id.* at 38. Ms. Gibson said Child has some special needs, including meeting with an infectious disease doctor and recent developmental concerns for which a referral for Early Intervention is necessary. *Id.* Ms. Gibson testified that Foster Parents have kept up with Child's medical care. *See id.*

She stated Child is bonded with her foster family, and loves watching her older biological half-sibling dance and play. *Id.* at 39. Ms. Gibson said Child looks to Foster Mother for feeding and care, and "[i]t's like a mother to a child." *Id.* at 66; *see also id.* at 60. Ms. Gibson testified Child "is happily ensconced in this family. … They all love her. The [Foster Parents] have an extended family who support their adoption if it comes to that and love [Child] as if she was their own granddaughter." *Id.* at 66-67. Ultimately, Ms. Gibson did not believe termination of Mother's parental rights would be harmful for Child, and she recommended Mother's parental rights be terminated and the goal changed to adoption. *Id.* at 39, 66-67.

Finally, Foster Mother testified her family consists of her husband, two sons, a daughter (Child's biological half-sibling), and Child. *Id.* at 70. Prior to Mother's being missing, Foster Mother stated Mother did not attend any medical appointments for Child, despite Foster Mother's initially notifying her of them, and indicated Mother did not usually ask for updates from the appointments. *Id.* at 73, 78. Since Mother has returned from being missing, Foster Mother noted her contact with Mother has "been a little more consistent, maybe once a week every other week." *Id.* at 73. Foster Mother confirmed she is an adoptive resource for Child and, if Mother's parental rights were terminated, she is open to maintaining contact with Mother. *Id.* at 75.[6]

_____

[6] When asked if Mother has contact with Child's biological half-sibling, who was five years old at the time of the hearing, Foster Mother testified Mother
*(Footnote Continued Next Page)*

- 13 -

Foster Mother said Child crawls and follows Foster Mother everywhere, and she and her husband love Child like their own. ***See id.*** at 74-75.

At the conclusion of the hearing, Child's legal counsel stated she was unable to ascertain Child's wishes given Child's age, and deferred to the recommendation of the GAL. ***Id.*** at 82. Child's GAL opined Child's best interests would be met by termination. ***Id.*** at 83-84.

Subsequently, the trial court involuntarily terminated Mother's parental rights pursuant to Sections 2511(a)(2), (5), and (b), and it changed the permanency goal to adoption. Attorney Hawn filed timely notices of appeal on Mother's behalf, along with Pa.R.A.P. 1925(c)(4) statements of intent to file an ***Anders*** brief. Because Attorney Hawn indicated he would be filing an ***Anders*** brief, the trial court issued a statement in lieu of an opinion, in which it briefly noted its reasons in support of its decision. Attorney Hawn filed an ***Anders*** brief and application to withdraw on February 11, 2026. In the ***Anders*** brief, Attorney Hawn sets forth the following issues for our review:

> 1. Did the trial court abuse its discretion or commit an error of law when it found — only nine months into the [C]hild's dependency — sufficient grounds for termination of [Mother's] parental rights … under [S]ections 2511(a)(2), 2511(a)(5), and 2511(b) of the Adoption Act, 23 Pa.C.S. §§ 2511(a)(2), 2511(a)(5) & 2511(b)?
>
> 2. Did the trial court abuse its discretion or commit an error of law when it found — only nine months into the [C]hild's dependency — that the [C]hild's permanent placement goal of reunification was neither appropriate, nor feasible[,] and ordered a goal change

---

did not reach out to the biological half-sibling before Child was placed in Foster Parents' home. N.T. at 76. Since then, Foster Mother stated Mother has had two or three FaceTime phone calls with Child's biological half-sibling. ***Id.***

to adoption, thus contravening [S]ection 6351(f) of the Juvenile Act, 42 Pa.C.S. § 6351(f)?

***Anders*** Brief at 4.[7]

## Analysis

### ***Anders/Santiago***

Attorney Hawn asserts Mother's appeal is wholly frivolous. Accordingly,

[t]his Court must first pass upon counsel's petition to withdraw before reviewing the merits of the underlying issues presented by [the appellant]. ***Commonwealth v. Goodwin***, 928 A.2d 287, 290 (Pa. Super. 2007) (*en banc*).

Prior to withdrawing as counsel on a direct appeal under ***Anders***, counsel must file a brief that meets the requirements established by our Supreme Court in ***Santiago***. The brief must:

(1) provide a summary of the procedural history and facts, with citations to the record;

(2) refer to anything in the record that counsel believes arguably supports the appeal;

(3) set forth counsel's conclusion that the appeal is frivolous; and

(4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Santiago***, 978 A.2d at 361. Counsel also must provide a copy of the ***Anders*** brief to his client. Attending the brief must be a letter that advises the client of his right to: "(1) retain new counsel to pursue the appeal; (2) proceed *pro se* on appeal; or (3) raise any points that the appellant deems worthy of the court[']s attention in addition to the points raised by counsel in the ***Anders*** brief." ***Commonwealth v. Nischan***, 928 A.2d 349, 353 (Pa. Super. 2007), *appeal denied*, … 936 A.2d 40 ([Pa.] 2007).

---

[7] CYS, Child's legal counsel, and Child's GAL each filed statements in lieu of a brief, indicating Mother's appeals are wholly frivolous.

*Commonwealth v. Orellana*, 86 A.3d 877, 879-80 (Pa. Super. 2014). After concluding counsel has satisfied these technical requirements of *Anders* and *Santiago*, this Court must then "conduct a simple review of the record to ascertain if there appear on its face to be arguably meritorious issues that counsel, intentionally or not, missed or misstated." *Commonwealth v. Dempster*, 187 A.3d 266, 272 (Pa. Super. 2018) (*en banc*).

Attorney Hawn's *Anders* brief complies with the above-stated requirements. He summarizes the case's factual and procedural history with citations to the record, he refers to parts of the record that could arguably support Mother's claims, and he concludes Mother's appeals are frivolous. Attorney Hawn also states his reasons for reaching that conclusion with discussion of relevant facts and legal authority. Moreover, he attached a letter directed to Mother to his *Anders* brief, in which he advised Mother of the rights enumerated in *Nischan*, and also certified service of both the application and brief on Mother.[8] Accordingly, Attorney Hawn complied with the technical requirements for withdrawal. We now independently review the record to determine if Mother's issues are frivolous, and to ascertain if there are any other, non-frivolous issues she could pursue on appeal.

### Termination of Mother's Parental Rights

Mother argues the trial court erred and abused its discretion when it found — only nine months into Child's dependency — that sufficient grounds

---

[8] To date, Mother has not filed any response.

existed for involuntary termination of her parental rights under Sections 2511(a)(2), (a)(5), and (b). ***See Anders*** Brief at 14. She claims the trial court failed to give proper weight to her ongoing progress and disregarded the developing mother-child bond. ***Id.*** at 14, 18, 19.

In conducting our review, we are required to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. ***In re Adoption of S.P.***, 47 A.3d 817, 826 (Pa. 2012) (citation omitted). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." ***Id.*** (citations omitted). Further, "an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." ***Id.*** (citations omitted).

Section 2511 governs the termination of parental rights and involves a bifurcated analysis. ***See In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). This Court has explained:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between

parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (cleaned up). We only must agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Additionally, "we may uphold a termination decision if any proper basis exists for the result reached." *In re Adoption of A.H.*, 247 A.3d 439, 442 (Pa. Super. 2021) (citation omitted).

*Section 2511(a)(2)*

We review the involuntary termination of Mother's rights under Section 2511(a)(2). Section 2511(a)(2) sets forth a basis for termination when:

The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

This Court has stated:

To satisfy the requirements of Section 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.

*In re Adoption of A.H.*, 247 A.3d at 443 (cleaned up).

Here, in setting forth the reasoning for its decision, the trial court explained Mother "met none of her reunification objectives and had not seen the [C]hild since the [C]hild's removal in February 2025 until September 2025, just two months prior to the hearing, due to failure to appear at scheduled parenting assessments or communicate with CYS." Trial Court Opinion (TCO), 1/9/26, at 1-2. The trial court also noted "Mother did not so much as appear at the termination and goal-change hearing." *Id.* at 2.

The record adequately supports the trial court's determination Section 2511(a)(2) has been satisfied. With respect to the first prong of Section 2511(a)(2), the record demonstrates Mother's repeated and continued incapacity, neglect, or refusal. Namely, Mother suffers from mental health and substance use issues, lacks consistent income and appropriate housing for herself and Child, and fails to safely and stably care for Child.

Section 2511(a)(2)'s second prong is likewise fulfilled. The record shows Mother's incapacity, neglect, or refusal has caused Child to be without essential parental care, control, or subsistence. Child was removed from Mother's care in February 2025, after Mother appeared under the influence and exhibited erratic behavior while holding Child. While the record does not seem to support the trial court's finding that Mother had not seen Child from the time of her removal in February 2025 until September 2025, the record does establish Mother's visitation with Child has been highly irregular. Ms. Warner testified Mother attended three out of five visits at ABC and was ultimately closed out of visitation at ABC on June 12, 2025, due to her failure

to respond to ABC's visitation coordinator. It appears Mother's last visit with Child at ABC occurred on March 28, 2025. CYS Exhibit #4 OC (ABC Discharge Summary, 6/12/25). Ms. Gibson testified Foster Mother subsequently provided a visit with Child to Mother in April 2025. After the April 2025 visit, Mother then did not see Child until September 2025. From late September 2025 until November 7, 2025, Mother had five roughly one-hour visits with Child — which were also attended by Foster Mother and Ms. Gibson — at Burger King. According to Foster Mother, Mother has not attended any medical appointments for Child.

Last, Section 2511(a)(2)'s third prong is satisfied, as the record sustains the trial court's finding the causes of Mother's incapacity, neglect, or refusal cannot or will not be remedied. At the time of the hearing, Mother still did not have consistent employment and appropriate housing for herself and Child; had not completed a FAST parenting assessment or the requested drug screens; had not regularly attended visits and medical appointments with Child; and had failed to follow through with drug and alcohol treatment until just a few weeks before the hearing. Ms. Gibson testified she did not expect that giving Mother more time to work on these objectives would make a difference:

> I think [Mother] will be a go-getter for a period of time and I think it will end. I just don't see it going to completion. And she knew that we had a termination hearing [originally] scheduled in December at the point in time when she did resurface. And she was told that right up front. So whether that's what initiated her contact with services[,] it very well could be.

***

I honestly don't feel that five more months will do anything different with the case. She may progress more. I don't know. With what I've seen with the providers I work with who have worked with her[,] they have also expressed frustration and they're the professionals who were treating her.

So I would just have to go off of that, my communication with her, my history with her, her history with Dauphin County [where the dependency and termination proceedings for Mother's other two children occurred], and I would just say I don't see five months really making a big difference.

***

Her counselor through Gaudenzia [West Shore] … reports being frustrated with [Mother's] level of commitment to the program. … [H]er certified recovery specialist, now this is the one initially back in February, started out with all good things. [Mother] was engaged and ready to make a difference.

And within two weeks[, the certified recovery specialist] expressed the frustration with the lack of communication, the transient thoughts [Mother] would have, and the belief that [Mother] knows the direction but was not interested in what the certified recovery specialist was working with her on. My frustration is the lack of focus that she has, too.

Conversations are all over the place. I mean, if you could see my case file with notes, I get a different story from one week to the next in speaking with her and where her services are. One week she's working with this provider. The next week she's going to try this one.

N.T. at 54-56 (formatting modified).

Based on the foregoing, we see no error or abuse of discretion by the trial court in terminating Mother's parental rights pursuant to Section 2511(a)(2). Thus, we turn to Section 2511(b).

*Section 2511(b)*

Section 2511(b) states, in pertinent part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

With regard to Section 2511(b), our Supreme Court has instructed:

[C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).

Here, the trial court found:

[C]hild was less than a month old at the time of removal, only 10 months old at the time of the hearing, and had spent the last 8 months of her life being cared for and loved by her foster family, which adopted the [C]hild's biological sister three years prior. The [C]hild has bonded to this family as her own, and minimally bonded with Mother, if at all. Any bond was neither necessary nor beneficial given, *inter alia*, the [C]hild's age, the recent extended period of no contact with Mother, the [C]hild's lack of long-term familiarity with Mother, and Mother's inconsistent contact and lack

- 22 -

of progress. Nonetheless, the foster family intends to continue to facilitate contact between the [C]hild and Mother as the family has done for the [C]hild's biological sister.

TCO at 2.

The record supports the trial court's determination Section 2511(b) is met. Over the course of this case, Mother has gone extended periods of time without visiting with Child. When she has recently visited with Child, it has generally been for an hour once a week. While Ms. Gibson said a bond was starting to grow between Mother and Child, she stated Child is bonded with her foster family, looks to Foster Mother for care, and loves to watch her older biological half-sibling dance and play. Ms. Gibson also believed no harm would be caused to Child if Mother's rights were terminated, and she recommended termination. Foster Mother corroborated Child's bond with her, noting Child follows Foster Mother everywhere when she crawls. Since mid-March 2025, Foster Parents have been tending to Child's needs and Foster Mother has indicated she and her husband want to adopt Child. As such, we conclude the trial court did not err or abuse its discretion in finding that termination of Mother's parental rights would best serve Child's developmental, physical, and emotional needs and welfare under Section 2511(b).

### Goal Change

Mother also insists the trial court erred or abused its discretion by changing Child's permanency goal to adoption. **Anders** Brief at 15. However, as we have already determined the trial court did not err or abuse in discretion in terminating Mother's parental rights, Mother's goal change arguments are

- 23 -

moot. ***See In re Adoption of A.H.***, 247 A.3d at 446 (observing "the effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change [the c]hild's goal to adoption") (citation omitted); ***Interest of D.R.W.***, 227 A.3d 905, 917 (Pa. Super. 2020) ("An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect.") (citation omitted).

### Conclusion

In conclusion, we agree with Attorney Hawn that Mother's issues are frivolous, and our examination of the record discloses no other, non-frivolous issues Mother could pursue on appeal. Thus, we grant Attorney Hawn's application to withdraw, affirm the termination decree, and dismiss Mother's appeal from the goal change order as moot.

Application to withdraw granted. Termination decree affirmed. Appeal from goal change order dismissed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/29/2026

- 24 -